# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE 1999 SESSION

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **FILED** * | No. W1998-02099-CCA-R3-CD |
| **Appellee** | **December 30, 1999** * | MADISON COUNTY |
| **V.** | * **Cecil Crowson, Jr.** | Hon. Franklin Murchison, Judge |
| **MICHAEL CARROLL,** | **Appellate Court Clerk** | (First Degree Murder, Especially Aggravated Robbery, Conspiracy to Commit Aggravated Robbery, Unlawful Possession of a Weapon) |
| **Appellant.** | * | |

| For Appellant | For Appellee |
|---|---|
| C. Mark Donahoe | Paul G. Summers |
| Spragins, Barnett, Cobb & Butler, PLC | Attorney General and Reporter |
| 312 East Lafayette Street | 425 Fifth Avenue North |
| Jackson, TN 38302-2004 | Nashville, TN 37243-0493 |
| | |
| | Patricia C. Kussmann |
| | Assistant Attorney General |
| | Criminal Justice Division |
| | 425 Fifth Avenue North |
| | Nashville, TN 37243-0493 |

OPINION FILED:


AFFIRMED


NORMA MCGEE OGLE, JUDGE

**OPINION**

The appellant, Michael Carroll, appeals his convictions in the Madison County Circuit Court on November 13, 1997, of first degree felony murder, especially aggravated robbery, conspiracy to commit aggravated robbery, and the unlawful possession of a weapon. The trial court imposed a sentence of life imprisonment for the first degree murder conviction. Additionally, the trial court ordered that the appellant serve his life sentence consecutively to concurrent sentences of twenty-two years and six months for the especially aggravated robbery conviction, four years and six months for the conspiracy conviction, and one year and six months for the unlawful possession of a weapon conviction. On appeal, the appellant presents the following issues for our consideration:

1. Whether the Madison County Juvenile Court and the trial court erroneously declined to suppress the appellant's statement to the police.

2. Whether the juvenile court erroneously transferred the appellant to the Madison County Circuit Court to be tried as an adult.

3. Whether handwritten inventories of handguns stolen from Wink's Ole Time Sporting Goods Store and their corresponding serial numbers constituted the best evidence of the serial numbers.

4. Whether the trial court erroneously declined to declare a mistrial due to the jury's exposure to evidence of other crimes committed by the appellant.

5. Whether the trial court erroneously declined to grant the appellant's motion for a judgment of acquittal at the close of the State's proof and whether the evidence adduced at trial was sufficient to support the jury's verdict.

Following a thorough review of the record and the parties' briefs, we affirm the judgment of the trial court.

**I. Procedural History**

The appellant's convictions arose from the robbery of Wink's Ole Time Sporting Goods Store (Wink's) in Jackson, Tennessee, and the murder of the proprietor, Marcus "Wink" Winberry, on May 14, 1996. The police arrested the appellant, who was sixteen years old, on May 21, 1996. Following his arrest, the

2

appellant provided a statement to the police implicating in the crime both himself and other members of a local gang known as the "Vice Lords." On July 10, 1996, upon the State's petition, the Madison County Juvenile Court conducted a hearing to determine whether the appellant and his two juvenile co-defendants should be transferred to the Madison County Circuit Court pursuant to Tenn. Code. Ann. § 37-1-134 (1996).[1] At the transfer hearing, the appellant unsuccessfully challenged the admissibility of his statement to the police. Moreover, upon the State's presentation of proof, including the appellant's statement to the police, the trial court concluded that the transfer of the appellant was appropriate. Accordingly, on September 3, 1996, a Madison County Grand Jury indicted the appellant for the instant offenses.[2] The appellant again challenged the admissibility of his statement to the police, submitting a motion to suppress the statement to the trial court on April 4, 1997. Following a suppression hearing on September 2, 1997, the trial court ruled that the appellant's statement was admissible at his trial. The appellant's case proceeded to trial on September 22, 1997.

## II. Factual Background

At the appellant's trial, the State introduced into evidence the appellant's statement to the police, in which he confessed to committing the charged offenses. In his statement, the appellant recounted that, several days prior to the robbery and murder, a friend, Jerry Dewayne Anderson, informed the appellant and another friend, John Alexander Watson, that he had shoplifted a .22 caliber pistol from "Wink" Winberry's sporting goods store. The group then discussed the possibility of robbing the store in order to obtain more guns. The group developed a plan according to which they would enter the store during business hours, preferably

---

[1]The appellant's transfer hearing was consolidated with the hearings in the cases of his co-defendants, Jerry DeWayne Anderson and John Alexander Watson. See State v. Abbott, No. 01C01-9704-CC-00122, 1998 WL 847919, at *11 (Tenn. Crim. App. at Nashville, December 9, 1998)(consolidation of transfer hearings is permissible when the crimes charged in each case arise from the same incident).

[2]With respect to the conspiracy charge, the appellant was originally indicted for conspiracy to commit especially aggravated robbery. However, at the conclusion of the State's proof, the trial court effectively granted the appellant's motion for judgment of acquittal of conspiracy to commit especially aggravated robbery and instructed the jury on the lesser included offense of conspiracy to commit aggravated robbery.

at a time when the owner was alone in the store.  The appellant would then hold Mr. Winberry at gunpoint while his companions collected any handguns on display in the store.  The appellant enlisted his twenty-one year old cousin, James Lee Carroll, Jr., to provide transportation to and from the robbery.

On May 14, 1996, the appellant and his companions decided to execute their plan and armed themselves in preparation for the robbery, the appellant acquiring a .22 caliber, semi-automatic Revelation rifle.  At first, events proceeded largely according to plan, the group seizing numerous handguns from Wink's in addition to Mr. Winberry's wallet.  However, while Anderson and Watson shattered the glass on several display cases and collected the handguns contained in the cases, Mr. Winberry attempted to seize the appellant's rifle.  The appellant recalled the ensuing events:

> I pulled [the rifle] away.  I kept telling him to stay down. He was still getting up.  That's when I took the gun off safety.  He was reaching for a gun on the counter.  I shot him in the leg thinking he was going to fall down, but he didn't.  He kept reaching for the gun.  I started running and shooting.  I wasn't looking at him when I was shooting.  I shot about four fast times.  I was running when I hit something and lost the gun.  I ran out fast. . . . I was the first one back to the car. . . .  I said, "I hope he didn't die."

Afterwards, James Carroll drove the group to his apartment where they divided the stolen guns.  Anderson then departed on his bicycle, while Carroll drove the appellant and Watson home.  Several days later, the appellant met with Anderson and two other friends, Zannie Pearson and William Dawkins.  They took numerous photographs of themselves posing with several guns, including guns stolen from Wink's.  The appellant was unable to tell the police the current location of any of the stolen guns.  Moreover, with respect to Mr. Winberry's wallet, the appellant stated that he last saw the wallet during the drive home from Carroll's residence on the day of the robbery and murder.  The appellant recounted that, after Carroll examined Mr. Winberry's wallet, Watson indicated that he would dispose of the wallet by burning it or throwing it in a ditch.

4

In addition to the appellant's statement to the police, the State presented the testimony of Gordon Ray White, an officer employed by the Madison County Sheriff's Department. Officer White testified that, following the appellant's arrest, on June 11, 1996, he overheard a conversation between the appellant and other inmates of the county penal farm, during which the appellant stated that he "would not have had to shoot him if he hadn't tried to grab the 30.06."

The appellant's co-defendant Watson also testified on behalf of the State at trial and substantially corroborated the appellant's account of the robbery. Watson testified that he was fourteen years old at the time of the robbery and murder. He stated that he, Anderson, and the appellant were members of a gang known as the Vice Lords. Watson explained that he and his companions decided to commit the present robbery in order to obtain handguns for the Vice Lords. Furthermore, Anderson had successfully shoplifted a gun from Wink's, and the proprietor was "real old." Watson recounted that, in preparation for the robbery, Watson and his companions donned gloves and armed themselves. According to Watson, he was carrying his father's .22 caliber, single action Davis Industries derringer, Anderson was carrying the .22 caliber, semi-automatic AMT pistol that he had shoplifted from Wink's, and the appellant was carrying a .22 caliber, semi-automatic Revelation rifle. At trial, Watson identified the Davis Industries derringer, the AMT pistol, and the Revelation rifle. Moreover, he identified a .9 millimeter, semi-automatic Ruger pistol that he, Anderson, and the appellant stole from Wink's on the occasion of these offenses. Finally, Watson testified that the appellant was the only participant in the robbery who fired a weapon, denying that either he or Anderson fired their weapons.

The State additionally presented the testimony of sixteen year old Zannie Pearson. According to Pearson, he was present when Anderson shoplifted the AMT pistol from Wink's. He further asserted that, following this incident, he suggested to Anderson that they rob Wink's for additional guns. Pearson stated that no one else participated in this discussion and that he was unsure how the appellant

5

became involved in the ensuing robbery and murder. In any event, Pearson did not participate in the present offenses, as he was in school on the date in question. However, following the robbery and murder, Pearson, along with Anderson, the appellant, and another friend named "Sentel" Dawkins, took photographs of themselves posing with weapons stolen from Wink's. At the appellant's trial, Pearson identified the photographs and also identified, as weapons depicted in the photographs, the AMT and Ruger pistols also identified by Watson. Pearson recalled that the police seized both the photographs and the handguns when they arrested both him and Anderson.

David Nolton,[3] a patrolman with the Jackson Police Department, testified that, several days after the robbery and murder, on May 17, 1996, he was dispatched to an apartment in "Allenton Heights" pursuant to a report that a gun had been discharged at that location. At the apartment, he encountered both Pearson and Anderson and further discovered several handguns and photographs depicting the suspects and other individuals posing with the handguns. The weapons recovered by Officer Nolton and depicted in the photographs included the AMT and Ruger pistols identified by both Watson and Pearson.

The State also called Kenneth Bevis, an employee of Wink's at the time of the present offenses, to testify at the appellant's trial. Mr. Bevis stated that, following the robbery and murder, he compiled inventories of missing weapons and corresponding serial numbers using a "Federal Firearms Log Book" maintained by the store. Mr. Bevis concluded that, in addition to an AMT pistol shoplifted shortly before the robbery and murder, a total amount of twenty-three guns were missing from the store, guns worth between seven and ten thousand dollars.

Mr. Bevis further testified that the serial number on the AMT pistol seized by police from Pearson and Anderson corresponded with the serial number of the shoplifted AMT pistol included on his inventory of stolen weapons. Mr. Bevis

---

[3]Elsewhere in the record, Officer Nolton's name is also spelled "Knolton."

then identified the Ruger pistol, recovered by Officer Nolton from Pearson and Anderson, as a handgun that had been on display in Wink's prior to these offenses. Moreover, the serial number on the Ruger pistol matched one of the serial numbers listed on his inventory.

Mike Turner, a crime scene technician employed by the Jackson Police Department, testified that police recovered from the scene of the crimes three spent .22 caliber long rifle cartridge cases, one spent .22 caliber long rifle bullet, several bullet fragments, and the previously identified .22 caliber, semi-automatic Revelation rifle. Additionally, the medical examiner recovered one spent .22 caliber long rifle bullet from the body of the victim. Don Carmin, a forensic scientist employed by the Tennessee Bureau of Investigation (T.B.I.) at the T.B.I. Crime Laboratory, testified that the three spent cartridge cases and the two spent bullets were fired from the Revelation rifle. The bullet fragments were not amenable to testing due to their size.

Dr. O'Brien Clary Smith, the Deputy Chief Medical Examiner for Western Tennessee and an Associate Professor of Pathology in the Division of Forensic Pathology at the University of Tennessee Medical School, conducted an autopsy on Mr. Winberry on May 15, 1996. He determined that the victim had died as a result of multiple gunshot wounds. Specifically, Dr. Smith testified that there were three "wound tracts" on Mr. Winberry's body, which could have been caused by two or three bullets. One wound tract was fatal and extended from Mr. Winberry's abdomen to his lower back, from which location Dr. Smith extracted a bullet. The remaining two tracts were superficial and penetrated Mr. Winberry's right and left thighs.

At the close of the State's proof, the appellant submitted a motion for a judgment of acquittal of all counts of the indictment. Upon the trial court's denial of

7

his motion,[4] the appellant declined to present evidence, arguing in closing that a first degree murder conviction was inappropriate because he had not intended to kill Mr. Winberry. The appellant also argued that a conviction of first degree murder would be inequitable in light of the more lenient treatment accorded to others involved in the planning or execution of the robbery.[5] Following deliberation, the jury found the appellant guilty of all counts of the indictment.

## III. Analysis

### A.    The Appellant's Confession

The appellant first challenges the admissibility, both at the transfer hearing in juvenile court and at his trial, of his statement to the police on May 21, 1996. The appellant argues that the police failed to comply with Tenn. Code. Ann. § 37-1-115 (1996) and that the appellant's confession was neither knowing nor voluntary. We disagree. In reaching our conclusion, we consider the entire record of proceedings. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Henderson, No. 03C01-9804-CR-00139, 1999 WL 398087, at *13 (Tenn. Crim. App. at Knoxville), perm. to appeal denied, (Tenn. 1999).

The record reflects that, between May 17, 1996, and May 20, 1996, the police obtained statements and photographs from Pearson and Anderson implicating the appellant, Watson, and Carroll in these offenses. On May 20, 1996, the police filed a petition with the Madison County Juvenile Court in accordance with Tenn. Code. Ann. § 37-1-120 (1996), setting forth the present offenses. The police arrested the appellant at approximately 4:00 a.m. or 4:30 a.m. on the following day.

---

[4]Again, after initially denying the appellant's motion, the trial court effectively granted the appellant's motion with respect to the charge of conspiracy to commit especially aggravated robbery, instructing the jury only on the lesser included offense of conspiracy to commit aggravated robbery.

[5]Anderson and Watson, who were also juveniles, were transferred to the Madison County Circuit Court along with the appellant but were tried separately. Accordingly, the record does not reflect the disposition of Anderson's case. Moreover, it is unclear from the record the offense or offenses to which Watson pled guilty. However, Watson did testify at the appellant's trial that he would receive an effective sentence of eight years incarceration and be placed on intensive probation in return for his testimony. With respect to James Carroll, the record reflects that the State proffered a plea agreement to Carroll in return for his testimony at the appellant's transfer hearing in juvenile court. However, the State later attempted to revoke its offer due to Carroll's claim at the transfer hearing that he was hearing voices. The record does not otherwise reflect the disposition of Carroll's case. Finally, Pearson's case was adjudicated in juvenile court. Although it is unclear the offense to which he pled guilty, he apparently received a suspended sentence of three years commitment to the Department of Youth Development in return for his testimony at the appellant's trial.

8

At that time, the police were unable to locate either the appellant's mother or another adult relative. Accordingly, the police incarcerated the appellant in the Madison County Juvenile Detention Center, and a detention hearing was scheduled for the following morning. Later on the morning of the appellant's arrest, at approximately 6:00 a.m., the police executed a search warrant at the appellant's residence. At this time, the appellant's mother telephoned the residence and informed the police that she was en route to the residence. An investigator waited at the residence for one hour, but the appellant's mother never appeared.

During the day of the appellant's arrest, the police continued their investigation, including conducting a three and one half hour interview of the appellant's co-defendant, Carroll, from 4:34 p.m. until 8:04 p.m. that evening. At about the time the police concluded their interview of Carroll, the appellant was transported from the juvenile detention center to the police department. Upon the appellant's arrival, Michael Ray Holt, a criminal investigator employed by the Violent Crimes Unit of the Jackson Police Department, attempted to locate the appellant's mother. The appellant provided Investigator Holt with three telephone numbers at which the investigator might be able to reach his mother. At the juvenile transfer hearing, Investigator Holt described ensuing efforts by the police:

> [W]e spent approximately an hour and a half to two hours calling numbers that Mr. Carroll had given us. We spoke with an aunt several times, and eve[n] requested that she come down, she declined to do so. I do not know her name, a number he gave me, she did confirm she was his aunt, she told us she was making effort to contact the mother. After approximately after two hours of doing so, and also the knowledge at the time Mr. Carroll was arrested that his mother could not be located either, ugh, pr[o]ceeded with the interview.

While Investigator Holt attempted to contact his mother, the appellant was seated in a chair nearby Investigator Holt's desk. The appellant was not handcuffed and, according to Investigator Holt, did not appear intimidated.

At 10:16 p.m., Investigator Holt and Investigator Donna Turner began interviewing the appellant in one of the interview rooms at the police department. Prior to the appellant's confession, Investigator Holt ascertained that the appellant

9

was in the ninth grade in high school, had previously been arrested, and was familiar with the interview process.[6] Moreover, in order to ensure that the appellant could read, the investigator asked the appellant to read the first line of the form advising the appellant of his Miranda rights and providing for the waiver of those rights. The appellant complied without difficulty. Investigator Holt then read to the appellant his Miranda rights, asking the appellant to read the form along with him. The investigator also read and explained that portion of the form permitting a waiver of Miranda rights. The appellant signed the form, informing Investigator Holt that he understood his rights but wished to provide a statement.

Investigator Holt testified that the appellant did not exhibit any reluctance to cooperate during the interview. Investigator Donna Turner further testified that the appellant was not threatened or subjected to violence during the interview. Moreover, Investigator Turner testified that, although she recalled discussing with the appellant the seriousness of the charge of first degree murder, she did not recall discussing the potential penalties for the offense. She denied ever stating to the appellant that the penalty for the present offenses would depend upon whether the appellant provided a statement to the police.

At the conclusion of the interview, Investigator Holt and the appellant reviewed the statement together. The appellant confirmed that the statement was accurate, signing each page. Finally, the appellant wrote the last two lines of the statement himself, asserting, "I'm sorry that Mr. Wink's got killed in the robbery, and it will never happen again." The interview concluded at 1:10 a.m.

At the suppression hearing in circuit court, the appellant testified on his own behalf. He testified that he informed investigators prior to his interview that he wanted his mother to be present during the interview. He also confirmed that the investigators attempted to locate his mother but were unsuccessful. He conceded

---

[6]The parties stipulated at the transfer hearing that the appellant possessed a record of juvenile adjudications.

10

that he understood that he could wait to provide a statement until his mother was present. Moreover, he testified that he read and understood his <u>Miranda</u> rights, including his right to remain silent and his right to an attorney. Nevertheless, according to the appellant, he decided to make a statement, because Investigator Turner indicated that he would otherwise receive a sentence of life imprisonment. Moreover, the appellant asserted that Investigator Holt remarked to him during the interview, "Bubba's going to be bending you over."

### i. Police Compliance with Tenn. Code. Ann. § 37-1-115

Initially, compliance with Tenn. Code Ann. § 37-1-115 is not a prerequisite to the admission of the appellant's confession at his trial before the Madison County Circuit Court. <u>State v. Lundy</u>, 808 S.W.2d 444, 446 (Tenn. 1991). However, Tenn. Code. Ann. § 37-1-127(c) (1996) provides that "[a]n extra-judicial statement, if obtained in the course of violation of [general statutory provisions relating to juvenile courts and proceedings] or which would be constitutionally inadmissible in a criminal proceeding, shall not be used against the child" in a juvenile court proceeding. Thus, when police take a child into custody and conduct an interrogation, the admissibility of any resultant statement in a juvenile court proceeding will depend *both* upon satisfaction of the reasonable time requirements of Tenn. Code. Ann. § 37-1-115 and the knowing and voluntary nature of the confession. <u>Lundy</u>, 808 S.W.2d at 446. <u>See also</u> <u>State v. Williams</u>, No. 02C01-9711-CR-00440, 1998 WL 855455, at *2 (Tenn. Crim. App. at Jackson, December 10, 1998), <u>perm. to appeal denied</u>, (Tenn. 1999).

In determining whether the police in this case satisfied the reasonable time requirements of Tenn. Code. Ann. § 37-1-115, it is important to note the distinctions the legislature drew in the statute governing juvenile courts and proceedings between taking a child into custody and placing a child in detention. <u>See</u> <u>State v. Turner</u>, 913 S.W.2d 158, 160 (Tenn. 1995)("[i]n interpreting statutes, we are required to construe them as a whole, read them in conjunction with their

11

surrounding parts, and view them consistently with the legislative purpose"). See also State v. Webster, 972 S.W.2d 701, 703 (Tenn. Crim. App. 1998). Under Tenn. Code. Ann. § 37-1-102(b)(8) (1996), custody means simply "the control of actual physical care of the child." In contrast, under Tenn. Code. Ann. § 37-1-102(b)(13), detention "means confinement in a secure or closed type facility which is under the direction or supervision of the court or a facility which is designated by the court or other authority as a place of confinement for juveniles." Tenn. Code. Ann. § 37-1-116 (1996) explicitly limits appropriate places of detention for juveniles, as opposed to custody of juveniles, to facilities including "*detention homes or centers for delinquent children which are under the direction or supervision of the court or other public authority*" and "*any other suitable place designated or operated by the court.*" Additionally, while a child may be placed in the custody of the State pursuant, generally, to the laws of arrest, Tenn. Code. Ann. § 37-1-113(a)(2) (1996), the detention of a child must be supported by probable cause that the child committed an offense either constituting a crime against a person resulting in serious injury or death or constituting unlawful possession of a weapon. Tenn. Code. Ann. § 37-1-114 (1996). Finally, applicable procedures change when a child's custodial status ripens into detention. Compare, Tenn. Code Ann. § 37-1-115 and Tenn. Code. Ann. § 37-1-117 (1996). See also Tenn. R. Juv. P. 5, 6, and 7.

Tenn. Code. Ann. § 37-1-115(a) governs the applicable procedures when police first take a child into custody. In relevant part, Tenn. Code Ann. § 37-1-115(a) provides that police, "within a reasonable time" thereof, must either

> (1) [r]elease the child to such child's parents, guardian or other custodian . . . unless such child's detention or shelter care is warranted or required under Tenn. Code. Ann. § 37-1-114; or
>
> (2) [b]ring the child before the court or deliver such child to a detention or shelter care facility designated by the court . . . . A person taking a child into custody shall give notice thereof . . . to a parent . . . and to the court.

Viewed in the context of the statute as a whole, this provision provides that, within a reasonable time of taking a child into custody, the police must either release the child to his parents' custody, bring the child before the court, *or place the child in an*

12

*appropriate detention facility for juveniles, thereby triggering procedural protections relating to the detention of juveniles.* In any case, the police must provide notice to the juvenile's parents.

In contrast, Tenn. Code. Ann. § 37-1-117(b) provides that, once a child is detained pursuant to Tenn. Code. Ann. § 37-1-114, the State must file a petition with the juvenile court and the child must be brought before the court for a detention hearing within three days, excluding non-judicial days, but in any case no longer than eighty-four hours after detention. See also Tenn. R. Juv. P. 6. The detention hearing is a preliminary hearing at which the trial court must determine whether there is in fact probable cause to believe that the child committed the charged offenses, whether it is in the best interest of the child and the public that the child be detained pending an adjudicatory hearing, and whether the child's detention is warranted or required by Tenn. Code. Ann. § 37-1-114. Tenn. R. Juv. P. 15(b). It is a basic principle of statutory construction that a specific provision relating to a particular subject controls and takes precedence over a general provision. See Webster, 972 S.W.2d at 703. Thus, once a child is placed in an appropriate juvenile detention facility, the reasonable time requirement of Tenn. Code. Ann. § 37-1-115 is transformed into the three day time limitation on conducting a detention hearing.

Again, the record in this case reflects that the police filed a petition with the court pursuant to Tenn. Code. Ann. § 37-1-120 on the day before the appellant's arrest. Following the appellant's arrest, the police immediately placed the appellant in the Madison County Juvenile Detention Center and scheduled a detention hearing for the next morning. The appellant does not contend that his detention hearing was untimely. Moreover, a preponderance of the evidence supports the juvenile court's finding that, on the day of the appellant's arrest and prior to any interrogation, the police notified both the appellant's mother and his aunt that he was in police custody. State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We conclude that the police complied with relevant statutory requirements relating to juvenile courts and

13

proceedings. Accordingly, the only remaining question is whether the appellant's confession was knowing and voluntary.

### ii. The Knowing and Voluntary Nature of the Appellant's Confession

In contrast to the State's compliance with Tenn. Code. Ann. § 37-1-115, see Lundy, 808 S.W.2d at 446, the knowing and voluntary nature of the appellant's confession is relevant both to the use of the appellant's confession at the juvenile transfer hearing and to the use of the confession at the appellant's trial. In either context, the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution provide the criminally accused a privilege against self-incrimination. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). An accused may waive this privilege provided the accused is apprised of his or her Miranda rights and knowingly and voluntarily waives those rights. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444-445, 479-478, 86 S.Ct. 1602, 1612, 1630 (1966)). The applicable standard in reviewing the validity of a Miranda waiver is the totality-of-the-circumstances test. Id. at 581-582. See also State v. Blocker, No. 03C01-9803-CR-00120, 1999 WL 124223, at *4 (Tenn. Crim. App. at Knoxville), perm. to appeal denied, (Tenn. 1999).

In the context of juvenile confessions, the totality-of-the-circumstances test requires consideration of the following factors: (1) the circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence; (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver; (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings; (4) any intoxication; (5) any mental disease, disorder, or retardation; and (6) the presence of a parent , guardian, or interested adult. Callahan, 979 S.W.2d at 583. With respect to these factors, the court in Callahan observed, "While courts should exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor . . . should by itself render a confession unconstitutional absent coercive police activity." Id. Thus, the admissibility of a juvenile's confession is not dependent upon

the presence of his parents at the interrogation. State v. King, No. 02C01-9509-CR-00280, 1997 WL 41256, at **3-4 (Tenn. Crim. App. at Jackson, February 4, 1997). After carefully considering all relevant factors, we conclude that the record preponderates in favor of the determination by both the juvenile court and the trial court that the appellant knowingly and voluntarily confessed to the robbery and murder of Mr. Winberry. See, e.g., State v. Williams, No. 01C01-9803-CR-00104, 1999 WL 191782, at *3 (Tenn. Crim. App. at Nashville), perm. to appeal denied, (Tenn. 1999)("[o]n appeal, the appellant has the burden of showing that the evidence preponderates against a finding that a confession was, in fact, knowing[ly] and voluntarily given"). This issue is without merit.

## B.    Transfer to the Madison County Circuit Court

The appellant next argues that the evidence adduced at the transfer hearing did not constitute "reasonable grounds" to believe that he had committed the present offenses. Tenn. Code. Ann. § 37-1-134(a)(4)(A). Specifically, the appellant asserts that the State failed to adequately corroborate his confession in whole or in part with additional evidence as required by Tenn. Code. Ann. § 37-1-127(e). According to the appellant, the only corroborating evidence presented by the State at the juvenile transfer hearing was the "unbelievable," "unreliable," and "totally worthless" testimony of James Carroll. Again, we must disagree.

First, even without Carroll's testimony, the State adduced abundant other evidence at the transfer hearing, which corroborated the appellant's confession and established reasonable grounds to believe that the appellant committed the charged offenses. In addition to the appellant's confession, the State introduced at the hearing the testimony of Mike Turner, an investigator with the Jackson Police Department. Investigator Turner's description of the scene of the crimes, including the shattered glass display cases, was consistent with the appellant's account of events. Moreover, the recovery by police of three spent .22 caliber cartridge cases and a .22 caliber Revelation rifle from the scene of the crimes was likewise consistent with the appellant's confession.

15

The State also presented the testimony of Officer Donna Turner[7] that, following the commission of the present offenses, she visited the Jackson-Madison County General Hospital, where she observed medical personnel attempting to treat the victim, Mr. Winberry. Consistent with the appellant's statement to the police that he had shot the victim at least once in the leg, she observed wounds on Mr. Winberry's legs in addition to a wound on his chest.

Investigator Holt also testified at the transfer hearing, confirming that Mr. Winberry died as a result of his wounds. Moreover, Investigator Holt testified that, following the present offenses and at the time of Anderson's and Pearson's arrests, the police recovered photographs of Anderson, the appellant, and other individuals posing with various handguns. Again, this testimony was consistent with the appellant's statement to the police that, following these offenses, he, Anderson, and other friends posed with handguns stolen from Wink's.

Finally, both Officer Nolton and Zannie Pearson corroborated to some extent the appellant's statements concerning Anderson's prior theft of a gun from Wink's, which provided the inspiration for the present offenses, and Anderson's participation in the present offenses. Specifically, Officer Nolton testified that Anderson and Pearson were arrested on May 17, 1996, several days after the robbery and murder, in possession of at least one weapon stolen from Wink's. Pearson confirmed that Anderson had shoplifted a .22 caliber pistol from Wink's prior to the present offenses and that, following the present offenses, he and Anderson were arrested in possession of several handguns, including the .22 caliber pistol.

As to Carroll's testimony, we decline to second-guess any consideration accorded this evidence by the juvenile court. Carroll recounted in some detail events which occurred on the day of the robbery and murder. Specifically, consistent with the appellant's confession, Carroll testified that he

_____

[7]In the transcript of the juvenile court proceedings, Officer Turner is referred to as "Donna Trelvin."

16

transported the appellant, Anderson, and Watson to Wink's on the day of the robbery and murder. One of the juveniles indicated to Carroll that a particular store clerk at Wink's would be willing to sell him bullets. Accordingly, Carroll briefly entered the store in order to ascertain which store clerk was present. At the transfer hearing, Carroll identified without hesitation the clerk that was present in the store. He further testified that, after briefly speaking with the store clerk, he returned to his car.

Upon returning to his car, Carroll began to drive toward home. He had only driven approximately two blocks when his three passengers asked him to stop the car. He observed them get out of the car and enter Wink's. Carroll recalled that, before the three juveniles left his car, he overheard them say, "Let's do it." At this point, according to Carroll, he was aware that both Anderson and Watson were armed, but did not realize that they intended to rob Wink's. In any event, the appellant, Anderson, and Watson soon reemerged from Wink's and walked quickly to the car. Carroll drove them back to his apartment.

Upon arriving at Carroll's apartment, the three juveniles showed Carroll numerous guns and stated that they had obtained the guns from Wink's. Furthermore, as Carroll was later driving the appellant and Watson home, one of the juveniles stated that he and his companions had robbed Wink's. Carroll concluded that he received fifty dollars and a gun from the group in return for his assistance.

During his direct testimony and on cross-examination, Carroll used his prior statement to the police to refresh his memory concerning several details. Subsequently, notwithstanding his ability to recall numerous events without referring to his prior statement and notwithstanding his ability to recognize the clerk who was present in Wink's when he entered the store on the day of these offenses, Carroll testified that he had no independent recollection of the above events. He explained that he hears voices and occasionally talks to his deceased parents. Indeed, he stated that he was hearing voices during the transfer hearing and suggested that the

17

voices might have supplied some of his testimony. Carroll stated that he had received treatment from a doctor at West Tennessee Behavioral Center and that he had been taking Prozac, Lithium, and Thorazine since 1992. He observed that, at the time of these offenses, at the time of his statement to the police, and at the transfer hearing, he was not taking his medication.

Virtually all witnesses may be allowed to testify, including mentally incompetent persons. Tenn. R. Evid. 601, Advisory Commission Comment. Of course, a party may attempt to impeach a witness by demonstrating his impaired capacity either at the time of the occurrence which is the subject of his testimony or at the time of his testimony. Tenn. R. Evid. 617; State v. Barnes, 703 S.W.2d 611, 617-618 (Tenn. 1985). If the witness' mental processes are so disturbed that he cannot recall the evidence in question, distinguish between reality and make-believe, or even understand his oath or affirmation, the evidence should be stricken. See also Neil P. Cohen et al., Tennessee Law of Evidence § 603.4, at 318-319, 320-321 (3d ed. 1995); Tenn. R. Evid. 401, 403, 603. In the final analysis, however, the competency of a witness is a matter entrusted to the sound discretion of the trial judge, who has the opportunity to observe the witness firsthand. State v. Caughron, 855 S.W.2d 526, 537-538 (Tenn. 1993); State v. Raines, No. 01C01-9704-CC-00127, 1998 WL 211737, at *3 (Tenn. Crim. App. at Nashville), perm. to appeal denied, (Tenn. 1998). See also State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997)(the admission of evidence, generally, is discretionary with the trial judge). Therefore, we conclude that the record of the transfer hearing amply supports the court's finding of reasonable grounds to believe that the appellant committed the present offenses.

**C.      The Admission at the Appellant's Trial of Handwritten Inventories of Stolen Weapons and their Corresponding Serial Numbers for the Purpose of Identifying the Stolen Weapons**

In his next issue, the appellant challenges the trial court's admission at his trial of two handwritten inventories of weapons stolen from Wink's and corresponding serial numbers, which inventories were compiled by Kenneth Bevis at

the direction of Mr. Winberry's widow. As previously noted, Mr. Bevis testified that he compiled the inventories of stolen weapons and their serial numbers using a "Federal Firearms Log Book" maintained by the store. According to Mr. Bevis, when Wink's went out of business, he mailed the log book to the Out of Business Records Center of the federal Bureau of Alcohol, Tobacco and Firearms. Thus, in identifying at trial the AMT pistol shoplifted by Anderson and the Ruger pistol stolen during the subsequent robbery and murder, Mr. Bevis referred only to his handwritten inventories.

In permitting Mr. Bevis to match serial numbers contained in the handwritten inventories with serial numbers affixed to the AMT and Ruger pistols, the trial court made the following ruling:

> I'm going to rule at least that the [Federal Firearms Log Book is] unavailable and I understand counsel's position. [It's] not a thousand percent unavailable, I don't guess, but I think because - - necessarily because I don't know whether they could be obtained by subpoena. I don't know whether they're in existence or not. I assume they are. I think that's a reasonable assumption, but at least they're sufficiently unavailable to allow this witness to testify concerning the serial number that he took from it.
>
> You've got to remember, too, that's it's arguable, that when he made a record of the serial numbers, that, in and of itself, becomes another business record of Wink's because it's something done in the regular course of the business, and I'm talking about the recording that he made of the serial number.

On appeal, the appellant maintains that the introduction of the handwritten inventories in lieu of the original log book violated the "best evidence" rule set forth in Tenn. R. Evid. 1002. The State responds that the handwritten inventories were admissible pursuant to the so-called "business records exception" to the hearsay rule. Tenn. R. Evid. 803(6).

Again, the admission of evidence is largely discretionary with the trial judge, and the exercise of his discretion will not be disturbed on appeal absent clear abuse. Gray, 960 S.W.2d at 606. However, we also note that the satisfaction of one rule of evidence does not necessarily preclude the exclusion of evidence pursuant to another rule. Yet, both the trial court and the State on appeal seemingly

suggest that, if a document satisfies the business records exception to the hearsay rule, the document itself becomes an "original" document for purposes of the best evidence rule. Tenn. R. Evid. 1001(3). The State on appeal effectively concedes that the inventories did not otherwise constitute the best evidence of the serial numbers.

Even assuming that a business record under Tenn. R. Evid. 803(6) qualifies as an "original" document, the State was required to establish the following prerequisites to application of the business records exception to the hearsay rule: (1) the records "custodian or other qualified witness" must testify; (2) the record must have been made at or near the time of the event, act, or condition; (3) a person with personal knowledge of the recorded event must have transmitted the information; (4) this person must have possessed a business duty to record the information; and (5) the record must have been made and kept in the regular course of business. Tenn. R. Evid. 803(6). See generally Neil P. Cohen, et al., Tennessee Law of Evidence § 803(6) (3d ed. 1995). We conclude that the State failed to satisfy its burden.

Mr. Bevis, as the sole employee of Wink's and the person who compiled the inventories in question, was qualified to testify concerning the inventories. See Alexander v. Inman, 903 S.W.2d 686, 700 (Tenn. App. 1995)("[t]o be considered qualified, a witness must be personally familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures"). See also State v. Hawkins, No. 01C01-9701-CR-00014, 1998 WL 352095, at *6 (Tenn. Crim. App. at Nashville, July 2, 1998), perm. to appeal denied, (Tenn. 1999). However, Mr. Bevis testified that, in compiling the inventories, he relied upon a log book rather than upon his personal knowledge. Presumably, the log book was itself a business record under Tenn. R. Evid. 803(6), and reference thereto in the handwritten inventories would not preclude admission of the inventories under the hearsay rule. Tenn. R. Evid. 805. Yet, the State adduced very little testimony concerning the maintenance of the log book itself. More

20

importantly, the State failed to establish whether it was the regular practice of Wink's to compile the handwritten inventories following a robbery or theft. Indeed, Mr. Bevis testified that, when Anderson shoplifted the AMT pistol, the store did not create any written report or record of the theft. Moreover, Mr. Bevis apparently carried one of the inventories folded in his wallet until providing the document to the State. In short, regardless of whether the inventories constituted the best evidence of the serial numbers, they were inadmissible as hearsay.

Nevertheless, any error in permitting Mr. Bevis to identify the AMT and Ruger pistols by reference to the handwritten inventories was entirely harmless. As noted by the State, Mr. Bevis was able to identify the Ruger pistol without the assistance of the inventories. Moreover, as already noted by this court, both Pearson and Watson identified the pistols at the appellant's trial as pistols stolen from Wink's. Finally, even absent the identification of the AMT and Ruger pistols, the evidence of the appellant's guilt was overwhelming. This issue is without merit.

**D.     The Jury's Exposure to Evidence of Other Crimes Committed by the Appellant.**

Citing Tenn. R. Evid. 404(b), the appellant additionally contends that the trial court erroneously declined to declare a mistrial due to the jury's exposure on four occasions to evidence of other crimes committed by the appellant. First, the appellant contends that, during his opening statement, the prosecutor improperly indicated that the appellant had previously engaged in shoplifting. Second, the appellant contends that evidence tags, attached to guns introduced into evidence, contained references to drug-related charges. Third, the appellant asserts that Officer Nolton referred to these drug charges during his testimony. Fourth, the appellant notes that Investigator Holt, in reading the appellant's statement to the jury, included a reference to drug use by the appellant.

A mistrial in a criminal case should only be declared in the event of "manifest necessity." State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998), cert. denied, __ U.S. __, 119 S.Ct. 1501 (1999). In other words, the entry of a mistrial is

21

appropriate only if a miscarriage of justice will otherwise occur.  State v. Allen, 976

S.W.2d 661, 668 (Tenn. Crim. App. 1997).  On appeal, our supreme court has

observed that

> "[w]hether an occurrence during the course of a trial
> warrants the entry of a mistrial is a matter which
> addresses itself to the sound discretion of the trial court;
> and this court will not interfere with the exercise of this
> discretion absent clear abuse appearing on the face of
> the record."

State v. Burns, 979 S.W.2d 276, 293 (Tenn. 1998), cert. denied, __ U.S. __, 119

S.Ct. 2402 (1999)(citation omitted).  See also Hall, 976 S.W.2d at 147; Allen, 976

S.W.2d at 668.

Initially, we note that the first three occurrences cited by the appellant

involved references to other crimes committed by Pearson and Anderson rather

than by the appellant.  The evidence adduced at trial unequivocally reflected that the

appellant was not involved in these offenses or even present during the commission

of these offenses, and the trial court instructed the jury that the appellant was not

involved in these offenses.  Under these circumstances, we cannot conclude that

the trial court abused its discretion in denying the appellant's motions for a mistrial.

Somewhat more problematic was Investigator Holt's inclusion, during

his recital of the appellant's statement, of a reference to drug use by the appellant.

Specifically, Investigator Holt recited the appellant's statement that the appellant,

Anderson, and Watson were smoking marijuana when they discussed robbing

Wink's.  On appeal, the State concedes that the appellant's statement to the police

concerning his use of marijuana was not admissible at trial pursuant to Tenn. R.

Evid. 404(b).  However, the State correctly notes that the trial court provided the

following curative instruction to the jury:

> There is something in the statement about smoking
> marijuana.  Now, let's don't lose our focus about this
> case.  This case is not about smoking marijuana.  This
> case is about an alleged murder, robbery and firearms
> violations.  That's what this case is about.  So let's don't
> draw any inferences against the defendant, Michael
> Carroll, on account of this marijuana thing that's in there.
> It would be just as well that it wasn't even in there, but
> there it is, it's part of the statement, so you know it, but

22

that's not what this case is about.

Without evidence to the contrary, we must presume that the jury followed the instructions of the trial court. Hall, 976 S.W.2d at 148; State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).[8] Accordingly, we again decline to overrule the trial court's exercise of discretion in denying the appellant's motion for a mistrial.

**E.      Motion for Judgment of Acquittal and Sufficiency of the Evidence**

Finally, the appellant contends that the trial court erred in denying his motion for a judgment of acquittal at the close of the State's proof and that the evidence is insufficient to support the jury's verdict of guilt. Again, the trial court did grant the appellant's motion with respect to the charged offense of conspiracy to commit especially aggravated robbery, instructing the jury instead on the lesser included offense of conspiracy to commit aggravated robbery. The court otherwise denied the appellant's motion, and the jury found the appellant guilty of all charged offenses.

We apply the same standard of review both to the trial court's denial of the appellant's motion for a judgment of acquittal and to the sufficiency of the evidence underlying the jury's verdict. State v. Ball, 973 S.W.2d 288, 292 (Tenn.Crim.App. 1998). Viewing the evidence in the light most favorable to the State, this court must determine whether any "reasonable trier of fact" could have found the essential elements of the charged offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e). We conclude that the evidence amply supports the jury's verdict.

---

[8]Moreover, as correctly noted by the trial court, the appellant was aware of the contents of his statement prior to trial and was aware that the State intended to introduce the statement. Yet, he never submitted a motion to the court to redact the portion at issue or otherwise brought the disputed portion to the attention of the trial court. Arguably, this issue is waived pursuant to Tenn. R. App. P. 36(a). See State v. Jones, No. 01C01-9708-CC-00326, 1999 WL 632305, at *15 (Tenn. Crim. App. at Nashville, August 19, 1999)(Tenn. R. Evid. 404(b) places the burden upon the defendant to request a jury out hearing).

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
Norma McGee Ogle,  Judge

CONCUR:

_____
David H. Welles, Judge


_____
David G. Hayes, Judge