# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 3, 2025 Session

## STATE OF TENNESSEE v. KYLER MICHAEL PRICE

**Appeal from the Circuit Court for Warren County**
No. 23-CR-4027     Larry B. Stanley, Jr., Judge
_____

### No. M2024-01567-CCA-R3-CD
_____

The Defendant, Kyler Michael Price, was convicted by a Warren County jury of reckless endangerment with a deadly weapon, a Class E felony, and driving without a valid license, a Class C misdemeanor.  He was sentenced by the trial court to concurrent terms of thirty days for the misdemeanor conviction and two years as a Range II offender for the felony conviction, with six months to serve in the county jail.  The Defendant raises three issues on appeal: (1) whether the evidence was legally sufficient to sustain his reckless endangerment conviction; (2) whether the trial court erred by allowing irrelevant and prejudicial testimony by a police officer about the officer's encounter with a different motorcyclist; and (3) whether the trial court erred by ordering confinement without correctly considering alternative sentencing.  Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and KYLE A. HIXSON, JJ., joined.

Craig Rouviere and Cayley J. Turrin, Franklin, Tennessee, for the appellant, Kyler Michael Price.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Chris Stanford, District Attorney General; and Daniel Barnes, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On December 30, 2022, a McMinnville Police Department ("MPD") officer was driving toward Woodbury the sound of an accelerating motorcycle engine caught his attention. In his rearview mirror, the officer saw behind him two motorcyclists -- one on a dark green or black motorcycle and the other on a white or silver motorcycle--pulling onto the highway from a Dollar General store and speeding side-by-side up a hill and out of sight. The officer activated his lights and siren, turned around, and initiated a pursuit. He caught up with the darker motorcycle but quickly ended his pursuit due to safety concerns.

Almost immediately after ending his pursuit of the darker motorcycle, the officer saw the Defendant behind him on the light-colored motorcycle. The officer again activated his lights and siren, and the Defendant pulled over and stopped. The Defendant admitted that he was one of the two motorcyclists the officer had pursued but denied that he fled from the officer, stating that he pulled off the highway into the parking lot of Hina's Market. The Defendant did not have a license to operate a motorcycle, and the officer found in the Defendant's possession a prescription pill bottle with what appeared to be six hydrocodone pills inside.

The Warren County Grand Jury indicted the Defendant for felony evading arrest, felony reckless endangerment, possession of hydrocodone, and driving without a valid license. At the conclusion of the State's proof at trial, the trial court granted the Defendant's motion for judgments of acquittal on the possession of hydrocodone and evading arrest counts of the indictment. The Defendant elected not to testify and did not present any proof. After deliberating, the jury convicted the Defendant of felony reckless endangerment and driving without a valid license.

## Relevant Proof at Trial

MPD Officer Grant Mullican testified that he was traveling outbound toward Woodbury on the New Nashville Highway, which he later explained became Main Street in McMinnville, when his attention was caught by the distinctive sound of a rapidly accelerating motorcycle engine. Looking in his rearview mirror, he saw two motorcycles "pull out of Dollar General [at Bridge Builders Road and] take off at a high rate of speed" traveling inbound toward McMinnville. One motorcycle was light-colored, possibly white, and the other motorcycle was dark green or black. Officer Mullican recalled that the motorcycles were traveling "handlebar to handlebar" at the same speed. He stated that it took the motorcycles only a few seconds to cover the approximate half mile from Bridge Builders Road to the top of a hill and a curve in the road where they were lost from sight,

- 2 -

and he estimated their speed as 100 miles per hour in the forty-five mile per hour speed zone. He identified three photographs of the area that he had recently taken, which showed several vehicles driving on the four-lane highway that had a middle turn lane. The photographs were admitted as a collective exhibit.

Officer Mullican testified that he initiated his lights and siren, turned his patrol vehicle around, and drove in the same direction the motorcycles had taken. He said he caught up to the darker motorcycle, but it "took off at a high rate of speed once again[.]" He did not see the light-colored motorcycle. He recalled that he may have briefly caught up with the darker motorcycle a second time before he terminated his pursuit in the vicinity of Old Shelbyville Road due to public safety concerns.

Officer Mullican testified that he had stopped and turned off his lights and siren after ending his pursuit of the darker motorcycle when he saw in his rearview mirror the light-colored motorcycle turning onto Old Shelbyville Road. At that point, he initiated his lights and siren and conducted a traffic stop of the Defendant, who was driving the light-colored motorcycle. Officer Mullican stated that he identified the Defendant by the Defendant's "[l]ight-colored motorcycle, street bike within that area/proximity" and by the camouflage jacket the Defendant was wearing. Officer Mullican's body camera video recording of the traffic stop was admitted as an exhibit and played for the jury. Officer Mullican agreed that the video recording reflected that the Defendant did not deny being one of the motorcyclists Officer Mullican had pursued. He said the Defendant stated that he had not run but had turned into Hina's Market and watched Officer Mullican drive past him. The Defendant told Officer Mullican that he did not have his license on him, but Officer Mullican learned from dispatch that the Defendant did not possess a license to operate a motorcycle.

Officer Mullican testified that Hina's Market was approximately 100 feet past the spot where he lost sight of the motorcycles, on the right side of the highway as he pursued the motorcyclists toward town. He estimated that he passed Hina's Market "within seconds" after he initiated his pursuit. Based on Officer Mullican's experience of owning and riding motorcycles, he believed it would have been impossible for the Defendant to have made the right turn into Hina's Market at the speed the Defendant was traveling "without leaving any tire marks, smoke, or without laying the bike down and crashing[.]"

On cross and re-cross examination, Officer Mullican repeated that the two motorcyclists "took off at a high rate of speed." He said he watched them in his rearview mirror "until they topped the hill"; by the time he turned around, they were out of sight. He did not see the light-colored motorcycle at Hina's Market as he passed, but he acknowledged the motorcycle could have been there and he missed seeing it. He could not recall the specific traffic conditions at the time but said that Nashville Highway was

"heavily trafficked" "99.9% of the time[.]" He did not recall if the Defendant weaved in and out of traffic and never saw the Defendant make any "evasive traffic maneuvers[.]" Officer Mullican acknowledged that he did not have radar and did not "pace" the Defendant and said that he estimated the Defendant's speed solely by watching the motorcycles in his rearview mirror.

Officer Mullican testified that the Defendant denied that the other motorcyclist was his friend or that they were traveling together. However, the Defendant and the second motorcyclist were "riding each other's hip[,]" which in Officer Mullican's experience indicated that they knew each other.

On redirect examination, Officer Mullican testified that he saw enough of the Defendant as the Defendant accelerated up the hill to identify him when he encountered him a short time later. He further testified that when he turned around to pursue the motorcycles, he "accelerated to a high rate of speed." He agreed that had the motorcycles been traveling at the speed limit, he would have caught up to them. He stated that he eventually caught up to the darker motorcycle, but he never caught up to the light-colored motorcycle.

MPD Lieutenant Paul Springer, who was in downtown McMinnville when he learned of Officer Mullican's attempt to stop two motorcycles, testified that he was driving down West Main Street when a "black sport bike" with the rider dressed in black "came around th[e] curve at [an] extremely high rate of speed" before it disappeared from view. He estimated the motorcycle's speed as 70 to 80 miles per hour in the 35 mile-per-hour zone and characterized the motorcyclist as "driving extremely fast and reckless." He stated that the motorcycle was traveling in the center turn lane, and that it came very close to his patrol vehicle. He assumed it was one of the two motorcycles pursued by Officer Mullican "because of space and time[,]" explaining that he encountered the motorcycle "within basically the . . . time it would take for . . . two vehicles coming towards each other to meet in the gap time when Officer Mullican called it out on the radio."

### Sentencing Hearing

Vickie Rowland, a manager with the Probation and Parole Department of the Tennessee Department of Correction, identified the Defendant's presentence report and certified copies of the Defendant's two 2016 felony convictions for theft of property valued at $1,000 or more, which were admitted as exhibits. The presentence report also reflected that the twenty-eight-year-old Defendant had several prior misdemeanor convictions, including a 2020 DUI conviction; had violated judicial diversion in a prior case; and had pending charges in Warren County for theft, vandalism, and aggravated burglary.

- 4 -

The presentence report further reflected that the Defendant completed the eleventh grade before being expelled from school for possession of Schedule VI drugs, was married, had three children, owned his home, and was employed. The Defendant reported that his 2020 DUI conviction was the result of his depression over the death of his mother. The Defendant stated that he was diagnosed with, and received treatment for, depression in 2022 following a suicide attempt but was no longer taking his prescribed antidepressant and had not had any issues with depression since then. The Defendant reported occasional past use of alcohol and marijuana and regular past use of Xanax from the age of seventeen to twenty. The Defendant stated that he stopped using Xanax in 2015 and in 2017 completed alcohol and drug classes with his wife. The Defendant's Strong-R assessment showed a moderate risk to reoffend, with high needs for education and mental health, and "recommended treatment pathways" of interpersonal skills, education, and basic supervision and support.

At the conclusion of the hearing, the trial court sentenced the Defendant to concurrent terms of thirty days for the misdemeanor conviction of driving without a valid license and two years as a Range II offender for the felony conviction of reckless endangerment. The trial court ordered that the Defendant serve six months of his two-year sentence for reckless endangerment in the county jail, finding that a sentence of full probation or other alternative sentencing would unduly depreciate the seriousness of the offense and that a sentence of confinement would serve as an effective deterrent to the Defendant and to others.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the Defendant contends that the trial court erred by denying his motion for judgment of acquittal on the reckless endangerment count of the indictment, arguing that the evidence was insufficient for the jury to find him guilty of the offense beyond a reasonable doubt. On appeal, this court applies the same standard of review to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. *State v. Carroll*, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). Therefore, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

For the purposes of this case, the Defendant's conviction of felony reckless endangerment required the State to prove beyond a reasonable doubt that the Defendant recklessly engaged in conduct that placed or may have placed another person in imminent danger of death or serious bodily injury, and that the Defendant committed the offense with a deadly weapon. Tenn. Code Ann. § 39-13-103(a), (b)(2).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-302(c). A vehicle may be a "deadly weapon" for the purposes of the reckless endangerment statute. *See State v. Wilson*, 211 S.W.3d 714, 719 (Tenn. 2007) (citation omitted).

A threat of death or serious bodily injury is imminent when a person is "placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) (citations omitted). The *Payne* Court defined the "zone of danger" as "that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others

were present in that zone or area." *Id.* at 28. The *Payne* Court concluded that the individuals present in the zone of danger need not be identified by name "but the State must show that a person or class of persons were in an area in which a reasonable probability of danger existed." *Id.*

In his appellate brief, the Defendant cites *State v. Byrd*, No. E2019-00850-CCA-R3-CD, 2020 WL 2844237 (Tenn. Crim. App. June 2, 2020) (concluding that an officer's pacing of a defendant's vehicle provided probable cause for the officer to stop the defendant for speeding), and *State v. Pickard*, No. M2011-01953-CCA-R3-CD, 2012 WL 2126938 (Tenn. Crim. App. June 12, 2012) (concluding that an officer who used radar to determine a defendant was driving 60 miles per hour had probable cause to stop the defendant for speeding), to argue that Officer Mullican's estimation of the Defendant's speed, absent corroboration through some method such as radar or pacing, "may not meet the threshold for establishing a zone of danger required for reckless endangerment." The Defendant also observes that the State failed to call any witness to testify that he or she was in a zone of danger. At oral argument, the Defendant added to his argument that the State failed to show that anyone was in the zone of danger by pointing out that the photographs showing vehicles on the highway were taken later, and that Officer Mullican was unable to recall the specific traffic conditions and could not say whether the Defendant was weaving or making any evasive maneuvers.

The State argues that neither *Pickard* nor *Byrd*, both of which involved certified questions of law regarding the legality of a warrantless traffic stop, stand for the proposition that an officer's observation of a defendant's speed is insufficient to establish that a defendant's behavior placed others in a zone of danger. In its brief, the State concedes that no witnesses testified that they were in the zone of danger but asserts that Officer Mullican's testimony "indicated that there were other vehicles on the heavily trafficked road at the time." However, the portions of the transcript that the State cites in support are those where Officer Mullican referred to only the darker motorcycle's actions and in which Officer Mullican appeared to explain how it is possible to estimate a vehicle's speed by watching it pass other vehicles. Regardless, at trial and at oral argument the State argued that the presence of the second motorcyclist was sufficient to satisfy the State's burden of demonstrating that someone other than the Defendant was in the zone of danger.

We agree with the State. Viewed in the light most favorable to the State, the evidence showed that the Defendant, who was traveling "handlebar to handlebar" with a second motorcyclist, raced up a hill that was followed by a curve in the road at a speed estimated by Officer Mullican as 100 miles per hour--far in excess of the forty-five miles-per-hour posted speed limit. The presence of the second motorcyclist was sufficient to show that another was placed at reasonable probability of danger by the Defendant's

actions. Accordingly, we affirm the Defendant's conviction of reckless endangerment with a deadly weapon.

## II. Testimony of Lieutenant Springer

The Defendant next contends that the trial court erred by allowing Lieutenant Springer to testify about his encounter with the darker motorcycle after the Defendant objected on the grounds of relevance. Citing *State v. McCord*, No. 01C019406CC00193, 1995 WL 464736 (Tenn. Crim. App. Aug. 4, 1995), the Defendant asserts that the testimony of Lieutenant Springer "was not relevant to the [D]efendant's matter at hand and was prejudicial to the [D]efendant and denied him a fair trial." The State argues that the trial court acted within its discretion in admitting the testimony, which the State asserts was relevant to show the Defendant's identity as one of the two motorcyclists who raced up the hill from the Dollar General store. The State further argues that, even if the trial court erred in admitting the testimony, the Defendant cannot show that he was prejudiced.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). An abuse of discretion occurs only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The record reflects that the Defendant objected on the grounds of relevance and moved to strike after Lieutenant Springer began his testimony about his encounter with the darker motorcycle. The trial court allowed the State to continue its questioning, and the Defendant renewed his objection and motion to strike the testimony. In the sidebar that followed, the Defendant argued that the entire line of questioning about the darker motorcycle was irrelevant and should be struck. The trial court responded that it would allow the Defendant to argue it in closing.

As the State points out, the case the Defendant cites in support of his argument that Lieutenant Springer's testimony was irrelevant and unfairly prejudicial is inapt to the situation in the case at bar. In *McCord*, this court concluded that the defendant, who was convicted of driving under the influence, was deprived of his right to a fair trial by the erroneous admission of a portion of videotape that showed his arresting officer's traffic stop of an unrelated motorist. *McCord*, 1995 WL 464736, at *1. By contrast, the second motorcyclist here was riding "handlebar to handlebar" with the Defendant when Officer Mullican observed the motorcycles speeding up the hill and out of sight. The second motorcyclist also met and passed Lieutenant Springer on the same road and within the time it would take for two vehicles traveling toward each other to meet after Officer Mullican contacted dispatch about his pursuit.

Moreover, as the State also notes, unlike in *McCord*, the Defendant here had the opportunity to cross-examine Lieutenant Springer and has not shown how he was prejudiced by the admission of the testimony. We, therefore, conclude that the trial court acted within its discretion in admitting the testimony.

### III. Sentencing

Lastly, the Defendant contends that the trial court abused its discretion "in giving the Defendant jail time and [not] consider[ing] alternative sentencing correctly."

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012) (applying the standard to alternative sentencing). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating and enhancement factors, (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant on his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

A defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* Tenn. Code Ann. § 40-35-303(a). A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See id.* §

40-35-102(6)(A). "[H]owever, a defendant's prior convictions shall be considered evidence to the contrary and, therefore, a defendant who is being sentenced for a third or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing[.]" *Id.*

Sentencing involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

*Id.* § 40-35-103(1). Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. *See id.* § 40-35-103(5).

The Defendant argues in his brief that the trial court erred in denying an alternative sentence "solely on [the] basis of deterrence" without evidence in the record that the sentence will have a deterrent effect on others. However, at oral argument, the Defendant conceded that the trial court's denial of an alternative sentence was based not just on the need for deterrence, but also to avoid depreciating the seriousness of the offense, and that the trial court acted within its discretion in sentencing. We agree. Accordingly, we affirm the sentences as imposed by the trial court.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE