IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 29, 2002

## STATE OF TENNESSEE v. KENNETH RAY STEWART

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 232733     Douglas A. Meyer, Judge**

---

**No. E2001-02117-CCA-R3-CD**
**May 29, 2003**

---

The Defendant, Kenneth Ray Stewart, was convicted by a Hamilton County jury of one count of attempted sexual battery. The trial court sentenced the Defendant to eleven months and twenty-nine days in the Hamilton County Workhouse, suspended the sentence, and ordered that the Defendant serve the sentence on supervised probation. Conditions of probation included counseling pursuant to a sex offender clinical evaluation and no contact with the victim. On appeal, the Defendant presents three issues for our review: (1) whether the trial court erred by allowing testimony by State witness Virgie Redden under the excited utterance exception to the hearsay rule; (2) whether the trial court erred by allowing the State to use leading questions during direct examination of the victim; and (3) whether the evidence was insufficient as a matter of law to support the Defendant's conviction for attempted sexual battery. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Kenneth Ray Stewart.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; and Parke Masterson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### I. PROCEDURAL HISTORY

Kenneth Ray Stewart was indicted by the Hamilton County Grand Jury for one count of rape, a Class B felony. A Hamilton County jury convicted the Defendant of the lesser-included offense of attempted sexual battery, a Class A misdemeanor. The Defendant was sentenced to eleven

months, twenty-nine days, to be served on supervised probation. Conditions of the Defendant's probation included counseling pursuant to a sex offender clinical evaluation and no contact with the victim.

On appeal, the Defendant presents three issues for our review: (1) whether the trial court erred by allowing testimony by State witness Virgie Redden under the excited utterance exception to the hearsay rule; (2) whether the trial court erred by allowing the State to use leading questions during direct examination of the victim; and (3) whether the evidence was insufficient as a matter of law to support the Defendant's conviction for attempted sexual battery. Finding no reversible error, we affirm the judgment of the trial court.

## II. FACTS

The following proof was presented at the Defendant's trial. Adam Orr, the teenage nephew of the victim, Frances Orr, testified that at the time of the offense in December, 1999, he lived in Soddy-Daisy, Tennessee, on property adjoining that of the victim. He stated that he had lived there with his parents, Sherry and Terrell Orr, and his sister, Melissa, all his life. Adam[1] stated that the Defendant is also a neighbor. He stated the victim lives alone. After identifying some photographs of the front and back porch of his aunt's house, Adam stated that behind the window to the left of the front door is the living room, and behind the window to the right is the bedroom. He also explained that on the back porch of the victim's house are two doors, one to the kitchen and the other to the bathroom.

Adam testified that on December 6, 1999, he had gone to visit his aunt at her home around 5:30 or 6:00 in the evening. He stated he entered through the front door, but could not remember if he locked the door after entering. Adam recalled that he stayed for about fifteen minutes and then left through the back door. Adam stated that he could see his aunt's house from his back yard, but he acknowledged that it was getting late, that the sun was down, and that it was hard to see. Adam testified that the only lighting in the area comes from "the lights out of the houses."

Adam testified that his attention was drawn to the victim's house when he saw that the victim had turned on her back porch light. He stated that he saw her come out her back door in a nightgown, "fiddle[] with a few things" and then go into the bathroom. Adam reported that he also saw the head of a person looking around the corner of the victim's house. He testified that he then saw his aunt come out of the bathroom and go back into the house through the kitchen door, turning out the porch light as she went inside.

Adam testified that he ran to the house and went around the side to the front corner by the living room. According to Adam, there was light coming from the kitchen and living room

_____

[1]Because Adam Orr, Frances Orr, Sherry Orr, Terrell Orr, Melissa Orr and Leon Orr share the same last name, we will refer to these witnesses by their first names. We intend no disrespect by this usage, but do so only to avoid continually utilizing their entire names.

windows. Adam stated that he saw the Defendant at the front door, which was open. He recalled that the first thing he heard after he arrived was the Defendant asking the victim if he could come in. Adam said he heard the victim say no and then, "Tell Marvin." Next, Adam stated that he heard the Defendant tell the victim that Marvin was not home. Adam identified Marvin as a brother of the victim who also lived nearby. Adam testified that the victim then told the Defendant she would tell her brother, Terrell, Adam's father, but the Defendant said that Terrell was not home either.

Adam testified that the Defendant walked off the porch, came toward him, and looked around the corner of the victim's house towards the house where Adam and his family lived. Adam reported that when the Defendant came toward him, he laid down. Adam stated that he then saw the Defendant turn around and walk back onto the porch, and he heard the Defendant ask the victim again if he could come in, because "it was cold." Adam testified that the victim said "no," but the Defendant just "kind of slipped by her. He just walked in."

Adam testified that after the front door closed, he jumped up onto the porch and looked into the living room through a hole in the blinds in the front window. He stated that he saw the victim and the Defendant sitting in the living room. Adam testified that he then ran home, told his mother, Sherry Orr, that the two were in the living room together, and then immediately ran back to the victim's front window. He testified that the only light on in the living room was a lamp in the back corner. Adam stated that he saw the victim and the Defendant sitting together on the couch with their backs to the window and their arms around each other. Adam testified that he could hear mumbling sounds, but he could not make out what was being said.

Adam testified that he saw the Defendant kiss the victim on the cheek, and the victim then walked into the kitchen. He reported that the Defendant walked to the middle of the room, and the victim returned and stood in the other corner of the living room. Adam stated that the Defendant set the table lamp in the corner on the floor, making it harder for Adam to see inside. Adam testified that the victim walked over and turned out the lamp, leaving no lights on in the house. Adam reported that he could hear talking in the bedroom, one of the rooms facing the front of the house. Adam then walked off the porch and went around to the back of the house. Adam stated that about five to ten minutes passed from the time he returned to the porch after telling his mother what he had seen until the time the light went out and the people in the house went into the bedroom.

Adam testified that while he was at the back of the house, his uncle, Leon Orr, another brother of the victim, pulled into the driveway. Adam reported that less than five minutes passed between the time the lights went out and Leon Orr's arrival. Adam stated that as Leon Orr pulled into the driveway, someone came out the back door, opened the screen door, looked out, and then closed the door. Adam stated that he then heard Leon knocking at the front door and telling the victim to let him in, but he could not hear any response. Adam testified that after Leon told the victim a few times to open the door, Leon "said he'd get the police there to knock the door in if he had to."

Adam testified that he returned to the front porch where he saw Leon, his wife, Nancy Orr, and Sherry Orr, the witness' mother. Leon then went into the house, where he and the Defendant talked. Adam stated that everyone then left and that as they were all walking out of the house, the Defendant said to Sherry Orr, "I hope you're satisfied for waking up the whole neighborhood."

Sherry Orr testified that she is the victim's sister-in-law and that she had been living near the victim for eighteen or nineteen years. She stated that she had known the Defendant for about twenty years. Sherry testified that although the victim is self-sufficient, "she just can't talk, can't speak[,]" and she stated that the victim had been unable to speak for twenty-six years.

Sherry stated that around 6:00 p.m. on the evening of the offense, she was at home, and her husband was at work. She reported that her son, Adam, came home and told her that the Defendant was in the victim's house. Sherry testified that she called Leon Orr, the victim's brother, who lives "right over the hill." She stated that after she called Leon, she went to the victim's back yard and stood behind a walnut tree, but she could not see or hear anything from there. She reported that she could see no lights on inside the house. Sherry stated that after Leon arrived, she approached the house. She testified that as the Defendant started to leave, he told her that he hoped she was satisfied that she had upset three families. She testified that she then told him he had no business being there and that he had been told to stay away.

Harlan Leon Orr testified that in December 1999, he lived about a mile and a half from the home of his brother, Terrell Orr. He testified that he knew the Defendant and that they had been "dear friends" their entire lives. He testified that the victim was "mentally challenged" and "a very trusting soul." He stated that the victim does not speak very well and that she says only two or three words at a time. He also testified that the victim has been like that since she was a baby.

Leon Orr testified that on the evening of December 6, 1999, he received a call from his sister-in-law, Sherry Orr, around 6:00 or 6:30. He stated that she told him that Adam Orr had seen the Defendant go into the victim's house and turn off all the lights and that she was "kind of concerned." Leon reported that he went to the victim's house, pulled in the driveway, and went to the door. He said that when he got there, no lights were on in the house.

Leon testified that he knocked on the door and asked the victim to open the door, but she said, "No, Leon." He testified that he demanded that she open the door, but she still refused. He stated that it did not sound like she was in the living room. Leon stated that the victim never came to the door, and he tried to enter the house on his own, but the door was locked. He testified that after he told the victim that he would kick the door in or call the police and have them kick the door in, the bedroom light came on, and the Defendant opened the door.

Leon testified that the Defendant asked him, "What's going on?" He responded, "Well, that's kind of what I wanted to know." Leon testified that the Defendant told him he was just visiting the victim. Leon reported that he told the Defendant that it did not "look right" for the Defendant to be in the house at night with all the lights off and that if he wanted to visit in the future,

the Defendant should come in the daylight or let someone know. Leon stated that he had no conversation with the victim about the Defendant's visit that evening. Leon testified that when the police arrived, he told the officers that it seemed that there had been a misunderstanding, and the police left. He then asked the Defendant to leave and to "[p]lease respect [his] wishes as a friend and not come back at that time of night."

On cross-examination, Leon testified that when he was at the victim's house, the victim did not appear hysterical but that she seemed "a little shook up." He stated, however, that "sometimes [the victim] gets that way without anything." He also stated that because his brother and his brother's wife had told him that the victim occasionally motions to people and flags them down from the street, he had previously had conversations with the victim telling her not to do that or to let anyone into her house after dark.

Virgie Redden, the victim's sister, testified that the victim was a normal child until the age of two when she had an ear infection with a fever that rose to 107 degrees, resulting in paralyzed speech cells and some minor brain damage. Redden stated that the victim had been living on her own since 1995 and that she is capable of taking care of herself, including doing all her own cooking, washing and housework. Redden testified that the victim needs help only with her grocery and other shopping. Redden reported that the members of the family who live nearby check on the victim frequently.

Redden testified that she had known the Defendant all her life and that the Defendant and his wife were "old family friends." However, Redden testified that sometime before December 1999, she told the Defendant "face-to-face" that she did not want him to be alone with the victim. Redden confirmed that the Defendant knew about the victim's disabilities and her condition.

Redden testified that on the night of December 6, 1999, she had been out to dinner with some friends and co-workers. She stated that when she returned home around 9:45 or 10:00 p.m., there was a message on her answering machine from Sherry Orr telling her to call as soon as she got home and telling her that it was important. Redden stated that after returning the call, she called the Defendant, but he would not talk on the phone, so she went to his house.

Redden testified that when she arrived at the Defendant's home, she asked him what he had been doing at her sister's house with all the lights out. The Defendant would only reply that he had made an error in judgment. Redden stated that she continued to ask questions, but the Defendant refused to answer, other than to say that he had already talked about it with Leon and that they had worked out the misunderstanding. Redden testified that she called Leon, and he denied having discussed it with the Defendant. Redden testified that she did not call the victim prior to going to the Defendant's house. Redden stated that the Defendant was "cocky . . . and that he was sweating real bad." Redden said the Defendant's wife was also there during the confrontation.

After leaving the Defendant's house, Redden said she saw a light on at the victim's home, so she went to check on her. Redden reported that she stepped onto the front porch and looked in

the window through the hole in the blinds. She testified the victim was "sitting on the love seat and she was crying, gulping crying. She couldn't hardly get her breath." Redden stated that when she knocked on the door, the victim jumped up and ran through the kitchen, yelling, "No, Kenneth! No, Kenneth!" Redden testified that when she identified herself, the victim came to the door and let her in, and they sat down on the love seat.

Redden testified that the victim was shaking and crying hard and had broken out in a bad sweat. Redden stated that she held the victim and said, "[W]hatever happened here tonight, let's talk about it. We'll deal with it. We'll go on from here." Redden testified that the victim then told her that the Defendant came inside uninvited. Redden said the victim cried some more, but Redden testified that after more assurances, the victim "took [Redden's] hand and she moved [Redden's] hand over and she took [Redden's] hand . . . and made one finger, and when she did, she put it between her legs and showed that [the Defendant] had gone inside of her with his finger." Redden testified that the victim had said, "up me" and was unable to say the word "inside." Redden testified that the victim started to cry again, and after telling her that they would "deal with it," Redden went home.

The victim, Frances Orr, testified that she was "three-one" years old. In one- to three-word answers, the victim testified that she lived in "Daisy," that she does not know how long she has lived there, but that she had never lived anywhere else. The victim was shown photographs which she identified as "[h]ouse, my house[,] . . . [m]y door[,] . . . [m]y bed" and "Ken house." She named some of her family. The victim said "night" when asked if she remembered the night the Defendant came to her house when she was alone. She testified that she told him "no" when he asked to come inside, but she did not remember what he said. The victim testified that she was wearing a "gown" and that when the Defendant came in, the lights inside the house were "off." When asked how they were turned off, she said "Kenneth." She testified that she did not want the Defendant to come in the house.

When asked if the Defendant made her go to any other rooms in the house, she stated "bedroom." She testified that she did not remember him kissing her in the bedroom or any time. When asked if he removed any of her clothes, she said, "[p]ants off." She did not remember saying anything to the Defendant.

The victim testified that when she and the Defendant were in the bedroom, the Defendant touched her with his "hand" and indicated where. When asked if the Defendant did something with his finger, the victim said, "[u]p me." She was asked to stand and demonstrate, and when asked if she meant "down where your underwear goes," the victim said, "[y]eah." She reported that it did not hurt. The victim testified that she said, "No, Kenneth." The victim stated that "Leon" came to the door, but she did not open it. When asked why, she said, "Kenneth." She testified that the police came, and she confirmed that she was upset. She also said she remembered telling Virgie Redden what had happened.

On cross-examination, the victim testified that prior to the incident with the Defendant, she was on the front porch when the Defendant walked down the road. She reported that he was standing at the end of her driveway, that he turned around, and that he came back into her house. She testified that they sat in the living room, but she was not trying to talk to him. She remembered the Defendant asking her what she was trying to say.

Mary Catherine Spada testified that she is a nurse practitioner who performs examinations when assaults are alleged of women and children eighteen years of age and under. She testified that she had a professional visit with the victim. She stated that she took a history from the victim and examined her. She testified that she was unable to perform a speculum exam, but did not "push for" one because there was no history of penile penetration. Spada stated that her findings were normal and were not inconsistent with digital penetration. Spada testified that with digital cases, she would not expect any damage at all. On cross-examination, Spada acknowledged that she could not make a conclusion from the inspection.

Alice Brown testified she is a detective with the Soddy Daisy Police Department with twenty years' experience. She testified that in December 1999, she took statements from family members in this case and also talked to the Defendant. She testified that after the Defendant was advised of his rights, she interviewed him regarding the offense. Brown stated that she wrote a report of what was said immediately after the interview. She testified that the Defendant also provided a written statement.

Brown stated that the Defendant told her that he had been walking in the area of the victim's house on the night in question because he had some stomach problems, and the victim waved for him to come into the house. The Defendant testified that by the time he reached the door, the victim had closed it. He reported that he went around to the back of the house and then went to the front again, by which time the victim had opened the door. According to the Defendant, the victim let him in. Brown noted that all of this information was also in the Defendant's written statement. She testified that the Defendant also told her in the interview that it had been several months since he had been to the victim's home because he really did not have a reason to be there.

Brown testified that she informed the Defendant of the allegations. She also testified that she told the Defendant that there was a witness to the offense, and she stated that he responded that he did not know how much someone could see peeping through a window blind with no lights on in the house. She stated that she told the Defendant that rape had been alleged, and she described what constituted rape. Brown testified that the Defendant "said he was not going to admit to a rape. He did not deny anything. He just stated that he was not going to admit to a rape." On cross-examination, Brown was unsure whether she had asked the Defendant if he had ever had sex with the victim. After reviewing her notes, Brown testified that her notes indicated that the Defendant had denied any prior sexual encounter with the victim.

The Defendant's wife, Sharon Fay Stewart, testified that she had been married to the Defendant for thirty-three years and that they lived close to the victim's home in Soddy-Daisy. She

stated that she had known and been friends with the victim for "a good thirty years." She also stated that she had known Virgie Redden the same length of time. Stewart stated that during Redden's visit to their home on December 6, 1999, Redden indicated that she had talked to the victim and had asked her some questions before arriving at the Stewart house. Stewart also stated that she and the Defendant encountered Redden sometime before December 6, 1999 at a restaurant, and during that meeting, Redden had invited them to visit the victim "anytime" to see some remodeling she had done.

The Defendant testified that he had known the victim all of her life and that he had been friends with her and her family for a long time. He stated that at around 6:15 p.m. on December 6, 1999, he had gone for a walk because his stomach was hurting. The Defendant recalled that as he approached the victim's house, he saw her on the front porch and Adam Orr leaving from the back porch. He testified that he "threw up his hand" to wave at Adam. He testified that the victim motioned for him to come to her, but he walked farther down the road before turning back and approaching the victim's door. Later, on cross-examination, the Defendant clarified that after the victim called to him, but before he returned to her house, the victim closed her door. The Defendant stated that when he knocked on the victim's door, there was no answer. Knowing that the victim likes to sit on the back steps, the Defendant stated he walked around to the side of the house and called her name. He testified that the victim did not answer, so he walked back to the road. He stated that as he reached the road, the victim again opened the front door and called to him. The Defendant reported that the victim held the door for him as they walked into the house.

The Defendant testified that they sat on different couches in the living room and talked. He stated that the victim "was trying to tell [him] something that night, and [he] never could figure out what she was trying to say." He explained, "She's a little hard to follow sometimes . . . ." The Defendant testified that after the victim made three attempts to tell him something, she got up, walked to him, sat down beside him, and put her head against his shoulder. The Defendant reported that the victim "reached up and kissed [him] on the lips." He stated, "It was just a little, friendly kiss on the lips."

The Defendant testified that after the victim kissed him, she got up and went to the kitchen. When she came back, the Defendant stated that he was preparing to leave because he needed to go home and get ready for work. According to the Defendant, the victim "came to [him], took [his] hand." The Defendant then testified, "There's an over head light. [The victim] reached up, pulled the light switch, walked into her bedroom and sat down on her bed, on the cot. I sat down first." The Defendant stated that the victim kept trying to tell him something and kept pointing toward the road. The Defendant testified that he heard a noise out back and went to look. He stated that he saw something moving on the back porch, so he opened the door and saw two shadows down at the front of the stairs. He stated that at that time, Leon Orr arrived.

The Defendant testified that when Leon Orr knocked and told the victim to open the door, she said "no Leon." The Defendant stated that he told the victim to open the door for her brother, but she refused, so he opened the door. The Defendant reported that Leon asked what was happening

-8-

and he explained that he was just there talking with the victim. The Defendant testified that the police arrived and took names, addresses, and phone numbers. He recalled that the officer asked for some lights to be turned on because there were no lights on in the house except one in the bedroom. According to the Defendant, after the police left, the Defendant and Leon talked for a minute. He stated that Leon then talked to the victim and warned her about "flagging down" people. After the Defendant engaged in a short exchange of words with Sherry Orr and another such exchange of words with Adam Orr, everyone left.

Finally, the Defendant testified regarding Virgie Redden's visit to his house. He stated that Redden had called him to talk, but he invited her to come to his house to talk in person. The Defendant reported that he, Redden, and his wife had a "nice conversation" about what happened. He also reported that Redden told him that she had talked to the victim before arriving at his house. The Defendant stated that Redden left at approximately 10:00 p.m. Finally, the Defendant denied digitally penetrating the victim's vagina. He maintained that he was not sexually attracted to the victim.

## III. ANALYSIS

### A. Admissibility of Evidence: Excited Utterance

The Defendant contends in this appeal that the trial court erroneously allowed Virgie Redden, over the objection of defense counsel, to testify about the account of the offense that the victim had given to her on the evening of the offense. Specifically, the Defendant argues that such evidence was inadmissible hearsay. Generally, the admissibility of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling with regard to the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002); State v. Carroll, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999). "An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore arbitrary, illogical, or unconscionable." State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 191 (Tenn. 2000).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial except as provided by the rules or otherwise by law. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). As such, an appellate court will not reverse a trial court's ruling regarding the admission or exclusion of hearsay evidence absent a clear showing that it abused its discretion. Id.

The trial court admitted the statement in this case under the excited utterance exception to the hearsay rule. Tennessee Rule of Evidence 803(2) provides that an otherwise inadmissible

hearsay statement is admissible if it "relat[es] to a startling event or condition [and is] made while the declarant was under the stress of excitement caused by the event or condition." In order for this exception to apply, three requirements must be met: (1) there must be a startling event or condition; (2) the statement must "relate to" the startling event or condition; and (3) the declarant must have made the statement while under the stress or excitement of the event or condition. Stout, 46 S.W.3d at 699-700; State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997).

> The rationale for admitting such statements, known as "excited utterances," is twofold: "First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it."

Gordon, 952 S.W.2d at 819-20 (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 803(2).1, at 532 (3d ed. 1995)).

The Defendant relies on our supreme court's language in State v. Smith, 857 S.W.2d 1 (Tenn. 1993), to contend that the circumstances of this case do not justify the admission of the hearsay evidence under this exception. See id. at 9. Smith holds that "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." Id. First, the Defendant argues that the State failed to pinpoint the "startling event." He asserts that the victim could have been startled either when her brother, Leon Orr, knocked on her door approximately five to ten minutes after the Defendant arrived, or when her sister, Virgie Redden, knocked on her door later, after 11:00 p.m. The Defendant asserts that because the victim could have been startled by an event other than his encounter with her, the State failed to satisfy the first prong of the test for admissibility, without which the entire exception fails.

We respectfully disagree. "Although the 'startling event' is usually the act or transaction upon which the legal controversy is based, such as an assault or accident, the exception is not limited to statements arising directly from such events; rather, a subsequent startling event or condition which is related to the prior event can produce an excited utterance." Gordon, 952 S.W.2d at 820. "'[A]ny event deemed startling is sufficient.'" Id. (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 803(2).2, at 53 (3d ed. 1995)). Similarly, the second requirement, that the statement "relate to" the startling event or condition, can be satisfied in many ways. "'[C]onsiderable leeway is available,' because the statement 'may describe all or part of the event or condition, or deal with the effect or impact of that event or condition.'" Id. (quoting Neil P. Cohen, et al., Tennessee Law of Evidence, § 803(2).2, at 53 (3d ed. 1995)). Consequently, even if the victim was upset by either her brother's or her sister's arrival, statements made by the victim as a reaction to that stress can

qualify as excited utterances, if it triggered a revival of the excitement or stress concerning and "relating to" the main traumatic event.

Second, the Defendant challenges the State's assertion, based on testimony by the victim's sister, Virgie Redden, that the victim was hysterical, could not breathe, and was crying just before the victim made her excited statement. The Defendant challenges this assertion as a "stretch of the evidence." The State points out that when Redden arrived at the victim's house, she could see that the victim was "on the couch, crying and shaking." Redden testified that she looked through a window and saw the victim crying before she knocked on the door. It is reasonable to conclude that the victim was reacting emotionally to her encounter with the Defendant, which further supports the State's argument that the trial court correctly determined that the victim's statement to Redden was an "excited utterance."

Finally, the Defendant challenges the spontaneity of the victim's statements and asserts that the victim could not have been "still laboring under the excitement caused by the event or condition" because of the amount of time that passed between the Defendant's visit and the victim's statement to her sister. However,

> [t]he time interval is but one consideration in determining whether a statement was made under stress or excitement: "Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress."

Id. "[T]he 'event must be sufficiently startling to suspend the normal, reflective thought processes of the declarant.'" Id. (quoting McCormick on Evidence, § 297, at 854 (3d ed. 1984)). In this case, we find the trial court well within the bounds of its discretion to find that the victim was laboring under the strain and excitement caused by the main startling event. This issue is without merit.

### B. Leading Direct Examination of the Victim

The Defendant next argues that the trial court erred in allowing the prosecution to lead the victim during direct examination. The State does not dispute that the prosecutor used leading questions to elicit testimony from the victim, but it contends that this manner of examination was appropriate in this case. "[T]he propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial court." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993). Tennessee Rule of Evidence 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop testimony." "It is within the discretion of the trial court whether to allow the use of leading questions on direct examination, and its decision in this regard will not be reversed absent an abuse of discretion." Kong C. Bounnam v. State, No. W2001-02603-CCA-R3-PC, 2002 Tenn. Crim. App. LEXIS 1097, at *26 (Tenn. Crim. App., Jackson, July 9, 2002) (citing Mothershed v. State, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978)).

The State suggests that the well-settled rule recognizing a trial court's discretion to permit leading questions of child sex offense victims, see Swafford v. State, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975), should apply to this case. The mental capacity of the victim in this case is not well established. When asked about the victim's condition, the victim's sister-in-law, Sherry Orr, testified, "She does everything for herself." When asked about the victim's disabilities, she stated, "She just can't talk, can't speak." The victim's brother, Leon Orr, testified, "I can't say that she's mentally retarded but she is mentally challenged . . . . She doesn't talk very well." The victim's sister, Virgie Redden, testified that when the victim was two years old, she had an ear infection and a fever that rose to 107 degrees, resulting in paralyzed speech cells and some minor brain damage. Redden also stated that the victim "live[s] on her own" and is capable of taking care of herself except for doing her own shopping. While the record does indicate that the victim in this case is impaired in some way, no expert testimony was presented to define her disabilities.

Nevertheless, the tender age of a victim is not the only basis on which a trial court may permit leading a witness on direct examination. At the bench conference on the Defendant's objection to leading questions, the prosecutor argued that the necessity for the leading questions was based not only on mental condition, but also on the victim's severe speech impediment. Our Court has previously held that a trial court did not abuse its discretion in allowing only leading questions when "[t]he record clearly demonstrate[d] that eliciting testimony from [the] victim was particularly difficult, perhaps due to age and perhaps due to physical impairment," when "[m]ost answers comprised only one to two words," and when "[t]he most critical questions often had to be repeated," State v. Craig Allen Lewis, No. 01C01-9307-CC-00232, 1995 Tenn. Crim. App. LEXIS 33, at ** 18-19 (Tenn. Crim. App., Nashville, Jan. 12, 1995). In another case, State v. Caughron, the Tennessee Supreme Court upheld the leading direct examination of a witness who was "young and highly emotional." 855 S.W.2d at 538. In supporting its decision, the Court mentioned that "in . . . [§ 611.6 of] Tennessee Law of Evidence, the writers suggest that leading questions may be used to shorten the time needed for a witness to testify or to facilitate the direct examination of a young or otherwise impaired witness." Id. (emphasis added). In this case, it is undisputed that the victim could not express herself as other witnesses can. We agree with the State that the trial court acted within its discretion in allowing the State to lead the victim during her testimony.

## C. Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented to convict him of attempted sexual battery. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a Defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal Defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

"Sexual battery is the unlawful sexual contact with a victim by a defendant accomplished without the consent of the victim and the defendant knows or has reason to know the victim did not consent; [or when] . . . [t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless . . . ." Tenn. Code Ann. § 39-13-505(a)(2)-(3). Sexual contact includes the intentional touching of the victim's intimate parts or the clothing covering those parts, if it can be reasonably construed as being for the purpose of sexual gratification. Id. § 39-13-501(6). Attempt of a crime requires that the defendant take a substantial step toward the actual commission of the underlying crime with intent to complete it. See id. § 39-12-101(a)(3).

In this case, the victim's testimony indicated that the Defendant attempted to, or actually did, intentionally touch the victim's intimate parts for the purpose of sexual arousal or gratification. At trial, the victim testified that the Defendant turned off the lights in her house and made her go into the bedroom with him. She also testified that the Defendant took off her underwear and touched her with his hand. While pointing to the area between her legs, the victim testified that the Defendant's finger was "up" her. The victim testified that she told the Defendant "no." Adam Orr testified that he saw the Defendant inside the victim's house and witnessed the Defendant kiss the victim on the cheek. He further testified that he witnessed the Defendant turn off the light inside the victim's house.

Virgie Redden testified that the victim told her that the Defendant put his finger on or inside her vaginal area. Redden testified that the victim pointed to the area between her legs and stated, "Up me." The Defendant admitted at trial that he went into the victim's bedroom at night while the lights were off in the house and sat down on her bed. However, he asserted that the victim was the one who kissed him and led him into her bedroom, and he denied any sexual contact with the victim.

Considering the evidence in the light most favorable to the prosecution, we find that the proof presented in this case demonstrated a sufficient basis from which the jury could reasonably have determined that the Defendant took a substantial step toward actual unlawful sexual contact with the victim, with intent to complete the crime, when he knew or had reason to know the victim did not

consent.  We therefore conclude that sufficient evidence supports the Defendant's conviction for attempted sexual battery.

## CONCLUSION

For the foregoing reasons, we find no error and therefore AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE