IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 9, 2008

## STATE OF TENNESSEE v. MARKESE ALEXANDER BROOKS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-05703     Chris B. Craft, Judge**

---

**No. W2007-02595-CCA-R3-CD  - Filed October 21, 2008**

---

The defendant, Markese Alexander Brooks, was convicted by a Shelby County Criminal Court jury of first degree felony murder and attempted especially aggravated robbery and was sentenced by the trial court to concurrent terms of life and ten years, respectively. In a timely appeal to this court, he challenges the sufficiency of the convicting evidence and argues that the trial court erred in denying his motion to suppress his statement to the police and in allowing inadmissible hearsay testimony from a State's witness. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Paul K. Guibao and Matthew S. Lyons, Memphis, Tennessee, for the appellant, Markese Alexander Brooks.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Pritchard and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On the evening of January 17, 2005, fifty-three-year-old Albert Covington was shot to death as he struggled with a shotgun-wielding assailant who was attempting with two accomplices to rob the Little Star Grocery at 547 Vance Avenue in Memphis, where the victim was employed as store manager. The sixteen-year-old defendant, hospitalized that same evening for shotgun wounds, admitted his involvement to police in an initial oral interview conducted at the hospital and in a written statement given the next day at the homicide office. He and two codefendants, Clarence

Anthony Abernathy and Frank DeAngelo Taylor, were subsequently indicted for the first degree felony murder and attempted especially aggravated robbery of the victim. The codefendants' cases were eventually severed, and the defendant was tried and convicted of the offenses in July 2007.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress his statements to police. At the November 20, 2006, suppression hearing, Sergeant T.J. Helldorfer of the Memphis Police Department's Homicide Bureau testified that he and Sergeant Miller interviewed the defendant in his hospital room on January 18, 2005. Kim Weiss, a guardian ad litem from juvenile court, was present for the interview at his request because the officers had been unsuccessful in their attempts to reach the defendant's parents or guardian. After ascertaining from the attending nurse that the defendant had suffered only a superficial wound and was not under the influence of any drugs, he and Sergeant Miller went over the Miranda warning with him, having him first read a portion of it aloud to ensure themselves of his ability to read. Weiss then went over the warning with the defendant as well, reading each line "very slowly" and explaining the rights to the defendant as she went through the document. The defendant exhibited no difficulty reading, indicated that he was willing to talk to the officers, and signed the waiver of rights form. He then gave an oral statement admitting his involvement in the shooting.

Sergeant Helldorfer testified that the defendant agreed to have his oral statement reduced to writing in a follow-up interview that took place the next day at the homicide office. Before beginning the interview, he went over the Miranda rights with the defendant again and the defendant signed another waiver of rights form indicating that he was willing to talk to the officers about the crimes. Neither the guardian ad litem nor the defendant's parent or guardian was present for the second interview. However, during the interim between the interviews, police officers had been in contact by telephone with both the defendant's mother, who lived in California, and with his aunt, who was his Memphis guardian. Sergeant Helldorfer testified that each woman gave her consent for the officers to speak further with the defendant on the basis that they did not "want him to take a charge alone."

Sergeant Helldorfer testified that the defendant reviewed his written statement and then initialed each page and signed the end of the document at 2:03 p.m. on January 19, 2005. He said the defendant gave no indication during either interview that he wished to stop talking or wanted to have an attorney or parent present. The defendant appeared to understand what he was doing and did not appear to be under the influence of any intoxicants. On cross-examination, Sergeant Helldorfer acknowledged that the guardian ad litem was not an attorney and that he never spoke with the defendant's physician about the defendant's medical condition.

At the conclusion of the hearing, the trial court noted, among other things, that the defendant was within two weeks of his seventeenth birthday at the time the statements were made, had completed the tenth grade, had an I.Q. of 95, and was employed at the Family Dollar Store. Applying the totality of the circumstances test as outlined in State v. Callahan, 979 S.W.2d 577

(Tenn. 1998), the trial court concluded that the statements had been freely and voluntarily made and accordingly denied the defendant's motion to suppress.

## Trial

Ella Neal, the victim's half-sister, testified that she was working at the Little Star Grocery with the victim on January 17, 2005. She said that the victim had been robbed in the past and consequently carried a handgun in his back pocket when he worked. At about 7:30 p.m., three young men entered the store at a time when there were no other customers present. Two stayed in the front while the third walked all the way around the store before announcing that he did not have enough money. The three men left but returned twice more. The third time they entered the store, one stood in front of the drink box, one stood by the door, and the third approached the victim and said, "This is a stick up, give me your money." When the victim replied that he did not have any money, the man pulled out a sawed-off shotgun. The victim grabbed it, and a struggle between the two men ensued. During that time, Neal ran to the phone, dialed 9-1-1, dropped the phone, ran behind the potato chip rack, and "hit the floor."

Neal testified that she was "curled up in a knot" on the floor when she heard a series of gunshots, followed by a moment of silence and two loud moans from the victim. She lay still, too frightened to move, until she heard other customers coming into the store, at which point she got up and called 9-1-1 again. Later, after the police had responded, she tried to open the cash register and found that the drawer was jammed shut. On cross-examination, she acknowledged that she had positively identified one of the robbers from a photographic spreadsheet but had been unable to identify the defendant.

Nineteen-year-old Clarence Abernathy testified that the charges against him were still pending and that he was currently housed in the jail awaiting trial. He said that on the morning of January 17, 2005, he was playing basketball in the Foote Homes area of South Memphis with the defendant and Frank Taylor, both of whom he knew from the neighborhood, when Taylor said that he wanted to rob someone. Abernathy stated that he jokingly responded that they should rob a store, immediately letting the others know that he was only kidding. Taylor, however, said that he was "for real" and looked at the defendant, who "nodded his shoulders" in agreement. Two other young men from the neighborhood, Elgie Busey and Deandre Crowder, were present and overheard the conversation.

Abernathy testified that he told Taylor and the defendant that they were crazy and went home. Later that same day, he met up with them again at "The Yellow Store," a neighborhood grocery, and accompanied them to Foote Homes, where they sat in the gazebo until early evening when the defendant suggested that they go to the Little Star Grocery. According to Abernathy, neither the defendant nor Taylor had said anything more about robbing anyone. He said that he, Busey, and Crowder walked with the defendant and Taylor to the store and that Busey remained outside while the rest of them went in. Once inside, Abernathy grabbed a drink from the drink box, carried it to the counter, and was in the process of reaching for his money to pay when he heard the defendant,

who had approached the victim in the back of the store, say, "This is a stick up." He then heard Neal say, "Don't shoot." When he looked over, he saw the defendant standing behind the victim with a shotgun at the victim's back.

Abernathy testified that the victim turned around and tried to grab the shotgun from the defendant. As the two wrestled over the weapon, Taylor began shooting a .22 handgun at the victim. Next, the victim grabbed the shotgun from the defendant, the defendant grabbed the victim's gun from his back pocket, the defendant shot the victim with the victim's handgun, and the victim shot the defendant in the chest with the defendant's shotgun.

After the victim shot the defendant, Abernathy fled to a vacant apartment, a regular gathering spot, followed closely by the others. When the defendant came in, he kept repeating that he had been hit and that "it ain't go right." Abernathy stated that he went home at that point but did not call the police because he was afraid someone would harm him or his family if he did. He claimed that he had been unaware that the defendant and Taylor had their respective weapons with them when they went to the store, although he had seen both of them with the weapons in the past. He said he was arrested two days later and gave a statement to police that was consistent with his trial testimony. Finally, he stated that he was testifying against the defendant because the victim, whom he had known as "Uncle Sonny," had been kind to him. On cross-examination, he denied that he had been promised anything in exchange for his testimony and reiterated that he had known nothing about the plan to rob the store.

Officer Nathan Newman of the Memphis Police Department testified that, when he and his partner responded to the scene, they found the victim lying on his stomach on top of a single-barrel shotgun with blood seeping out from underneath his body.

Officer Randall Fuller of the Memphis Police Department, who was assigned to the crime scene investigation unit in January 2005, identified the weapon recovered from the store as a twelve-gauge shotgun and the casing recovered from it as a twelve-gauge "field-load, possibly some type of bird-shot." He also identified a weapon that was found on the ground outside the store as a six-shot .357 Magnum revolver containing three live and three spent rounds.

Kelley Moore, a paramedic with the Memphis Fire Department, testified that the victim was dead when she responded to the scene. She said that approximately twenty minutes later, her dispatcher called for an ambulance to be sent to Fire Station 8 on Mississippi Boulevard in response to a walk-in gunshot wound. When she and her partner responded to that scene, located one-half mile from the Little Star Grocery, they found the defendant with what appeared to be a superficial gunshot wound to the chest caused by "bird spray from shotgun pellets."

Officer Vernon VanBuren of the Memphis Police Department, a crime scene investigation officer, identified, among other things, a California identification card in the defendant's name that was given to him when he responded to the Mississippi Boulevard fire station on January 17, 2005.

Lieutenant Mark Miller of the Memphis Police Department's homicide bureau testified that on the morning of January 18, 2005, Sergeant Luckett assigned him and Sergeant Helldorfer to interview the defendant in his hospital room at the Regional Medical Center. He described the interview process, including the role played by the guardian ad litem, and said that the defendant told them that he was shot during the robbery, in which "Buck" and another person he did not know participated. Because the officers did not have the equipment or personnel to transcribe the statement at the hospital, they told the defendant that he would be brought to their office to give a formal statement upon his release from the hospital.

The next day the defendant was released from the hospital, taken into custody, and brought to the homicide office, where he was again advised of his rights and once again signed the waiver of rights form before giving the second statement, which was transcribed. Lieutenant Miller said that the defendant's story changed slightly in the written statement, in that he identified his accomplices as "Frank" and "Woo," instead of "Buck" and an unknown individual. He stated that the defendant told them that he, Frank, and Woo formulated the plan for robbing the grocery store after talking about how they needed money, that Frank had a .22 pistol with him, and that they stopped and got a shotgun, which the defendant had with him during the robbery.

The portion of the defendant's statement in which he described the robbery itself reads as follows:

> Woo went in first, I went in behind Woo and Frank came in last behind me. Me and Woo walked to the drink machine and Woo grabbed a drink. He walked back up to the front. I up the gauge on the guy and he grabbed it. We were wrestling for less than two minutes. The guy turned around and he was facing away from me while both our hands were up in the air holding the gun. Frank was still standing by the door. When me and the guy had our hands up in the air on the gun that is when Frank shot. I am not sure how many times, maybe four or five. The guy was about to reach for the .357, but I grabbed it and he took the shotgun from me. He shot me with the shotgun in my chest. When he hit me with the shotgun, the .357 went off but it missed him. Then we all took off and ran. I got outside and I dropped the .357, jumped the gate, then I fell because I realized I had been hit. I looked up and everybody was gone. From there I walked to the fire station.

Lieutenant Miller testified that, beginning with the first interview, the defendant was advised of his rights a total of four times before the written statement was made. He said that the guardian ad litem was not present for the second statement but that Sergeant Luckett had talked to the defendant's mother and obtained her permission for them to interview the defendant. On cross-examination, he testified that an attempt was made to contact the defendant's parents or guardian before the first interview but that it was not done by himself.

Dr. Miguel Laboy, a medical examiner employed with the Shelby County Forensic Medical Center, which performed the autopsy of the victim's body, testified that the victim sustained three

gunshot wounds: a gunshot wound to the left side of the chest that damaged his heart and lungs; a gunshot wound to the right groin region that fractured his pelvis; and a gunshot wound to the back of the left forearm. He said that the victim probably died within seconds of the gunshot wound to the chest, which was consistent with a wound caused by a high velocity weapon such as a .357 handgun. He stated that the other two gunshot wounds were not consistent with ones fired by a high-velocity weapon.

The defendant elected not to testify but presented two witnesses in his behalf: Leslie Bailey, his mother; and Cathy McNamee Wilson, his aunt. Bailey testified that she spoke with the police a couple of days after the incident but did not recall giving them permission to take a statement from the defendant. Wilson testified that someone from the police department telephoned to ask her questions about the defendant but that she did not give anyone permission to speak with or take a statement from him.

In rebuttal, the State presented Lieutenant James Luckett of the Memphis Police Department, who testified that in January 2005 he was a sergeant assigned to the homicide bureau and the case coordinator for the Little Star Grocery murder investigation. He said that both the defendant's mother and aunt called him on the afternoon after the defendant's initial interview at the hospital. According to Lieutenant Luckett, both women gave him permission to talk with the defendant "because they wanted him to tell [the police] who was with him, so he wasn't doing this by himself."

## I. Denial of Motion to Suppress Statement

The defendant first contends that the trial court erred in denying his motion to suppress his written statement, arguing that under the totality of the circumstances, which included his youth, lack of a prior criminal record, recent gunshot wound with its attendant physical and mental stresses, and absence of a parent or guardian, the trial court should have found that the statement was involuntary and unknowing. The State argues that the evidence does not preponderate against the trial court's findings that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights. We agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In

Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)).

Tennessee courts use the federal "totality-of-the-circumstances test" to determine whether a defendant has knowingly, intelligently, and voluntarily waived his Miranda rights. State v. Callahan, 979 S.W.2d 577, 581-82 (Tenn. 1998). When analyzing the waiver of a juvenile under the totality-of-the-circumstances test, the following factors should be considered:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;
>
> (5) any mental disease, disorder, or retardation; and
>
> (6) the presence of a parent, guardian, or interested adult.

Id. at 583. While courts are required to use special care when scrutinizing a juvenile's purported waiver, "no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." Id. (citing Colorado v. Connelly, 479 U.S. 157, 167, 107 S. Ct. 515 (1986)).

The juvenile defendant in this case was almost seventeen years old, had completed the tenth grade, tested in the average range of intellectual functioning, and was employed. He had demonstrated his ability to read and write and, within the space of two days, been advised of his Miranda rights a total of four times, including by the guardian ad litem who carefully reviewed and explained the warning and rights to him. His gunshot wound was superficial, the attending nurse reported that he was not under the influence of any drugs during the interview at the hospital, and he had already been released from the hospital by the time the written statement was made the following day. Finally, although neither his mother nor aunt was present for the written statement,

the officers' testimony at the suppression hearing and trial was that the women had given their consent for the officers to talk to the defendant at the second interview.

The defendant asserts that Lieutenant Luckett "could not offer convincing proof at trial that he was the investigator who obtained parental permission to proceed with the [defendant's] interview on January 19, 2005." In support, he cites the following cross-examination testimony:

Q. [I]f [Lieutenant Miller] stated that you were the one who made those calls, in other words, initiated those calls, would he be incorrect?

A. I don't remember making them, but I don't remember that I didn't.

Q. But you stated earlier - -

A. We both may have tried to make them.

Q. But, you did state earlier, at least the testimony that you gave to the representative of the state, was that you delegated that responsibility to them; correct?

A. That's true.

The defendant contends that "[i]n light of the combined inconsistent testimony of Officers Miller, Helldorfer, and Luckett, it is apparent that nobody actually obtained permission to take a statement from [the defendant] from either his [m]other or his aunt." The transcript, however, reveals that the portion of Lieutenant Luckett's cross-examination testimony on which the defendant relies was in reference to which officer had attempted to contact the defendant's mother and aunt prior to the first interview. Lieutenant Luckett was unequivocal in his testimony that the women had given their consent, prior to the second interview, for the officers to speak further with the defendant. Moreover, as the State points out, "the admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation." State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999). Based on the totality of these circumstances, we conclude that the evidence does not preponderate against the trial court's findings that the defendant made his statement knowingly, intelligently, and voluntarily. Accordingly, we affirm the denial of the defendant's motion to suppress.

## II. State's Rebuttal Proof

The defendant next contends that the trial court erred by allowing Lieutenant Luckett's rebuttal testimony as to why the defendant's mother and aunt gave their consent for the officers to talk to the defendant about the crimes, arguing that it constituted inadmissible and prejudicial hearsay. The State argues that the evidence was not offered to prove the truth of the matter asserted but instead to show the women's motive for giving their consent and, as such, was properly admitted

by the trial court as non-hearsay evidence relevant to the issue of witness credibility. We agree with the State.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). Accordingly, we will not reverse the trial court's ruling on this issue absent a clear showing of an abuse of discretion.

During the State's case-in-chief, the trial court sustained the defendant's objection to proposed similar testimony by Lieutenant Miller on the basis that it would constitute prejudicial and non-probative opinion testimony by the defendant's parent as to his guilt. However, by the time that Lieutenant Luckett's rebuttal testimony was proposed, the defendant's mother and aunt had each testified, denying that they had given their consent for officers to talk to the defendant. Furthermore, it had become clear to the trial court that neither woman had spoken with the defendant about the crimes prior to their conversations with Lieutenant Luckett. Based on this, the trial court ruled that the evidence was admissible to impeach the witnesses' credibility:

> But since neither one of them spoke to him before they told the police they wanted him to give a statement, then what I'll do is, I'm going to allow the state to put that evidence on and then I am going to give a curative instruction to the jury that they are not to draw any opinion, if they believe that testimony, they're not to draw any opinion that any of the family members thought, or had any opinion about the guilt of the defendant, because they had not discussed anything about this and they were just merely talking to the police.
>
> . . . .
>
> I also will put in the jury charge that I read to the jury that prior inconsistent statements are not to be considered substantive evidence, but only to evaluate the credibility of the witnesses.

We conclude that there was no error in the trial court's admission of the evidence. The evidence was properly admitted to impeach the witnesses' credibility and the trial court issued an appropriate limiting instruction to the jury to that effect.

### III. Sufficiency of the Evidence

As his final issue, the defendant contends that the evidence was insufficient to sustain his convictions for first degree felony murder and attempted especially aggravated robbery. He asserts that Abernathy's testimony was not only biased but also uncorroborated by any evidence other than

the defendant's erroneously admitted statement to police, as the victim's sister, Neal, was unable to identify him as a perpetrator of the crimes. The State argues that Abernathy's credibility was an issue for the jury to determine and points out that his testimony was corroborated by the defendant's shotgun wound, for which the defendant offered no other explanation. The State further argues that even if the second statement should have been suppressed, the defendant's first oral statement established his presence and participation in the crimes. The State contends, therefore, that the evidence was more than sufficient to sustain the defendant's convictions. Once again, we agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (2006). The mental state required for conviction of felony murder is the intent to commit the underlying offense. Id. § 39-13-202(b).

Especially aggravated robbery is robbery that is accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. 39-13-401(a).

A person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a).

Viewed in the light most favorable to the State, the evidence established that the defendant, Taylor, and Abernathy discussed their need for money and then formed and implemented a plan to rob the Little Star Grocery, with Taylor arming himself with a .22 pistol and the defendant with the sawed-off, .12-gauge shotgun he used when demanding the victim's money. When the victim grabbed the weapon, the defendant struggled with him over its control until Taylor fired his .22 handgun at the victim. The defendant then grabbed the victim's .357 and shot him in the chest, causing his eventual death, just before being shot in turn by the victim, who had succeeded in wrestling the defendant's shotgun from him. A short time later, the defendant showed up at a nearby fire station with a shotgun wound to his chest and was transported to the hospital, where he gave an oral statement admitting his role in the crimes, which was followed by a substantially similar written statement made the next day at the homicide office. This evidence was more than sufficient for the jury to find the defendant guilty of first degree felony murder and attempted especially aggravated robbery beyond a reasonable doubt. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions.

## CONCLUSION

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's convictions and that the trial court did not err in allowing into evidence the defendant's statement

-11-

to police and Lieutenant Luckett's rebuttal testimony.  Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE